QUEN W. YOUNG AND SUZANNE O. YOUNG, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Young v. Commissioner
Docket No. 2229-76.
United States Tax Court
T.C. Memo 1978-19; 1978 Tax Ct. Memo LEXIS 496; 37 T.C.M. (CCH) 131; T.C.M. (RIA) 780019; January 18, 1978, Filed Robert L. Beery, for the petitioners. Eugene H. Ciranni, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined a $34,893.94 deficiency in petitioners' 1971 income tax, plus a $1,744.70 addition to the tax under section 6653(a). [1] The issues remaining for decision are: 1. Whether petitioners are entitled to deduct $15,765 "interest" allegedly expended in connection with the purchase of seven rental properties; 2. Whether petitioners are entitled to deduct $30,000 "interest" allegedly expended in connection with the purchase of undeveloped real property; and 3. Whether petitioners are entitled to deduct $6,483.57 for various business and entertainment expenditures. FINDINGS OF FACT At *498 the time they filed their petition, Dr. Quen Young and his wife Suzanne Young lived in South San Francisco, California. Suzanne Young is a party only by virtue of having filed a joint return with her husband. When we hereafter refer to petitioner, we will be referring to Dr. Quen Young. 1. Seven Rental Properties.
Aero Funding, Inc. ("Aero"), was a California corporation with $5,000 capital. Its sole shareholder was petitioner. Petitioner intended to provide Aero with cash and notes with which Aero could make real estate investments. Mr. John Clardy was petitioner's investment counselor. Clardy had acquired 400 to 500 single family homes in the Santa Rosa, California, area between 1966 and 1972 from savings and loan associations at foreclosure sales. During this period, Clardy sold these homes to various of his clients as he acquired them in the hopes they could be rented out and would appreciate in value. However, the rent freeze of August 15, 1971 froze the rent collectible from these homes below the cost of carrying the homes. Clardy therefore could only sell such homes to those clients who could meet the cost of ownership (i.e., could pay the excess of the carrying *499 costs over the rent collected). Petitioner was such a client. Equity Purchase, Inc. ("EPI"), was a corporation controlled by Clardy. Aero acquired seven of these homes on December 13, 1971 from EPI (which apparently either had bought them at foreclosure sales or had acquired them from Clardy) by assuming trust deed obligations outstanding against the properties in the aggregate sum of $122,705.48. Little or no money changed hands between Aero and EPI. Ten days later Aero sold these properties to petitioner for $157,670, using a wrap-around mortgage (i.e., Aero remained liable on the debt it had assumed on purchase of the properties, and petitioner became liable on a new debt equal to his purchase price less down payment). According to the documentation, petitioner paid $2,500 down and one year's "prepaid interest" of $15,675.The contract called for the balance of the purchase price (after crediting the $2,500 down payment) to be paid in two equal annual installments of $77,585. Another year's prepaid interest was to be paid with the first annual installment.Petitioner could have purchased the property directly from EPI had he chosen to do so. The price Aero agreed to pay *500 EPI for the seven parcels ($122,705.48) was their fair market value both on the date Aero purchased the properties and 10 days later when Aero sold them to petitioner for $34,964.52 more than it paid for them. The profit to Aero of $34,964.52 was a contribution to Aero's capital. Petitioner paid Aero $18,175 in 1971 in order to provide Aero with one year's needed capital. (The annual accrued expense to Aero against the property was projected by Clardy as $18,014.16.) Aero reported short-term capital gain of $15,855 ($34,964 less selling expenses, primarily back taxes, of $19,109.60) on this transaction, but did not report any prepaid interest as income on its return. 2. Cleveland Avenue Property.
EPI purchased certain undeveloped real property on Cleveland Avenue in Santa Rosa, California, for $129,000 cash from its then owners. Shortly thereafter, in December 1971, EPI "sold" the properties to petitioner for $300,000. [2] The fair market value of the property at the time was $136,000. Petitioner paid into escrow $330,000 as follows: (1) $30,000 cash labelled "prepaid interest." (2) $90,000 cash borrowed by petitioner from Great Western Savings and Loan, secured *501 by a first trust deed on the property. (3) $210,000 borrowed from Clardy or his wholly-owned corporation, [3] for which petitioner became payor on a $300,000 note payable to EPI (without due date, bearing interest at ten percent per annum, payable in advance) secured by a wrap-around second trust deed on the property. [4] In connection with this note, EPI assumed petitioner's debt of $90,000 to Great Western. All the debt involved was non-recourse debt. *502 Clardy, petitioner and Mr. Ken Cummings entered into an agreement to develop the land into condominium and office buildings. They were precluded from getting a building permit because the City of Santa Rosa declared a general building moratorium on September 15, 1972, which remained in effect until March 1973. Installments on the $90,000 loan from Great Western became due beginning in early 1972. EPI was unable to pay these installments on the loan. Because petitioner was unable to develop the land and unable or unwilling to pay the installments himself, he, in accordance with his agreement with Cummings, deeded the land to him. EPI lost its $210,000 in the land secured by the wrap-around second deed of trust, and forgave petitioner his $210,000 debt. Cummings got title to the land subject to Great Western's $90,000 debt secured by the first trust deed. Cummings and Great Western later developed the land. Petitioner was out his $30,000 cash payment, labeled prepaid interest, which is in issue in this case. Petitioner, according to the documents, made no down payment on the $300,000 purchase price for land worth $136,000. Instead he paid $30,000 "prepaid interest." The *503 $30,000 was payment for an option to buy the land and was not interest. 3. Various Business Deductions.
On his 1971 income tax return petitioner claimed various business expense deductions which respondent allowed as follows: Category
Claimed
Allowed
Adjustment
Dues and subscriptions
$ 789.00
$709.25
$ 79.25 4a
Utilities
230.00
162.77
67.23
Laundry
257.00
157.00
100.00
Conventions and meetings
2,983.00
273.33
2,709.67
Promotional expenses
4,047.00
519.58
3,527.42
$6,483.57
Petitioner's entertainment expenditures (listed as conventions and meetings and promotional expenses) were primarily incurred for business meals. These expenditures were entered on a daily basis in a diary maintained by petitioner.The entries included the name of the individual entertained, the place and the cost. If petitioner were attending a meeting, he would also identify the business group involved. Recorded expenditures of $25 or less which had a business purpose totalled $1,451.71. The remaining *504 recorded expenditures either listed no business purpose or were for more than $25 and petitioner had no receipts for such expenditures. Petitioner's other claimed expenditures were simply estimates made by his accountant. In his statutory notice, respondent disallowed in their entirety petitioner's claimed prepaid interest deductions in connection with the purchases of the seven rental properties and the Cleveland Avenue property.Respondent also disallowed the various business expense deductions as listed above. OPINION 1. Seven Rental Properties.
The first issue is whether petitioner is entitled to deduct as "interest" $15,675 paid in connection with the purchase of seven rental properties from Aero Funding, Inc. ("Aero"), petitioner's wholly-owned corporation. Petitioner asserts that this sum, labelled "prepaid interest" in the contract of purchase, is deductible under section 163. Respondent contends that this sum was not interest but a contribution of capital to Aero. Petitioner's wholly-owned corporation, Aero, purchased seven rental properties in the Santa Rosa area for $122,705.48; ten days later Aero sold these properties to petitioner for $157,670. Aero *505 had purchased the properties from Equity Purchase, Inc. ("EPI") solely by assuming the debts outstanding against the property. Had petitioner so chosen, he could have made the purchase for $122,705.48 instead of Aero. Having permitted Aero to make the purchase, petitioner could have caused Aero to resell at the same price. However, petitioner sought to increase Aero's capitalization and used these transactions to accomplish that purpose. Petitioner purchased the properties from Aero by paying $18,175 cash into escrow (labelled $2,500 "down payment" and $15,675 "prepaid interest") and giving a trust deed note for the balance ($157,670 less $2,500) of the purchase price. Aero remained liable on the original debt on the seven properties. This transaction was structured by Clardy, petitioner's investment counselor, who controlled the original seller, EPI. A deduction is generally allowed on "all interest paid or accrued within the taxable year on indebtedness." Section 163(a). "Interest" means compensation for the use or forbearance of money. Deputy v. du Pont,308 U.S. 488 (1940). *506 "Indebtedness" means an unconditional and legally enforceable obligation for the payment of money. Autenreith v. Commissioner,115 F. 2d 856, 858 (3d Cir. 1940), affg. 41 B.T.A. 319 (1940). It is well settled that in determining whether a payment constituted "interest * * * on indebtedness" economic realities govern over the form in which a transaction is cast. Knetsch v. United States,364 U.S. 361 (1960). We have found as a fact that petitioner created a profit to Aero of $34,964.52 as a contribution to its capital. Among other evidence we relied on was the testimony of Mr. Duane Shelton, an employee of Clardy, who arranged this transaction for petitioner. He testified that the purpose behind the structure was to allow petitioner to add to Aero's capital: Mr. Shelton: * * * we had to use a vehicle to get Aero Funding some equity. That's the way we got the equity. Whether or not--[the price paid by petitioner] that is a specific fair value in someone else's mind, I don't know. * * *
Respondent's counsel: * * * I'm asking, in effect, wasn't Dr. Young transferring funds or equities to Aero Funding by purchasing the *507 seven properties for thirty--approximately $35,000 more than Aero Funding had paid for them? Is that what Dr. Young was accomplishing? Mr. Shelton: Sure. It is also notable that Aero did not report any of its income from this transaction as interest. Instead, Aero reported a short-term capital gain from its sale of the properties to petitioner. Respondent argues that since the $34,964.52 "profit" to Aero was a contribution to Aero's capital, therefore all of the $15,675 labelled "prepaid interest" should be treated as part of that "profit" and disallowed as a deduction. However, we have difficulty with the latter step of his analysis. We agree that the "profit" must be recharacterized as a contribution to capital. But this raises rather than resolves the secondary question of whether all "interest" paid in should be recharacterized at the front end as part of such contribution, or whether all cash paid by petitioner to Aero should instead be prorated on the basis of treating $122,705.48 (77.82 percent) of the $157,670 price as purchase price and the remainder as contribution. Respondent's allocation method is flawed by the fact that even after the $15,675 had been paid, *508 petitioner still at least nominally owed Aero the full $157,670, including the full "profit" of $34,964.52. When and if Aero received the full $157,670, it would become necessary, under respondent's analysis, to recharacterize $15,675 of that amount as something other than purchase price or contribution to capital, lest the contribution become treated as more than the $34,964.52 agreed to or the purchase price be treated as more than $122,705.48 we have found. In other words, we do not find any necessary inconsistency between payment of prepaid interest and the existence of excess agreed purchase price which includes an element of contribution to capital. Whether the price is too high or not, interest prepaid does not reduce the principal owing. The high price does not alone convert interest into principal. But respondent advances, and we see, no reason other than the excessive price for treating the $15,675 as other than interest. Accordingly, we conclude that it was interest. To the extent of $12,268.99 it was prepaid interest on the $122,705.48 genuine portion of the purchase price. To the extent of $3,496.01 it was prepaid interest on what amounts to a capital contribution. *509 The promise of a shareholder to make a capital contribution to his wholly-owned corporation is gratuitous, devoid of consideration, and non-binding. Interest on such an obligation is therefore non-deductible. Linder v. Commissioner,68 T.C. 792, 796 (1977). As to the $12,268.99 interest payment allocable to the bona fide portion of the price, such interest under our holdings is non-deductible in the year of prepayment by a cash method taxpayer, if respondent has validly determined that a material distortion of income is thereby engendered. Sandor v. Commissioner,62 T.C. 469 (1974), affd. 536 F. 2d 874 (9th Cir. 1976); Burck v. Commissioner,63 T.C. 556 (1975), affd. 533 F. 2d 768 (2d Cir. 1976); Cole v. Commissioner,64 T.C. 1091 (1975), on appeal (9th Cir., Jan. 17, 1977). [5] However, respondent has made no such determination in this case, and relies instead on his determination that no part of the $15,675 was interest. We therefore need not reach the question of material distortion. *510 We conclude that $12,268.99 of the $15,675 claimed interest deduction is allowable. 2. Cleveland Avenue Properties.
The next issue is whether petitioner is entitled to deduct $30,000 "interest" allegedly expended in connection with a purchase of undeveloped real property on Cleveland Avenue in Santa Rosa, California. Petitioner asserts that this sum, labelled "prepaid interest" in the sales contract, is deductible pursuant to section 163. Respondent contends that petitioner did not have a sufficient equity interest in the property to support an interest deduction or, in the alternative, that this payment by petitioner was the down payment on the property. Petitioner purchased the undeveloped real property from EPI for $300,000. WPI had purchased the property several months previously for $129,000. The fair market value of the property was $136,000 at the time *511 EPI sold it to petitioner. EPI was controlled by Clardy, petitioner's investment counselor, who established the structure of petitioner's purchase. In order to purchase the property from EPI, petitioner placed into escrow $90,000 borrowed from Great Western Savings and Loan Association, $210,000 borrowed from Clardy or his wholly-owned corporation, and $30,000 of his own funds. He also placed into escrow his note for $300,000 representing his loan from Clardy or his corporation and EPI's assumption of his $90,000 debt to Great Western. EPI returned the $210,000 cash it received from petitioner to Clardy or his corporation, and used the remainder of the cash ($120,000) to pay the prior owners of the property. The net effect of the transaction was that petitioner acquired the undeveloped property for $30,000 "prepaid interest" plus a $300,000 non-recourse note payable to EPI but bearing no due date. Petitioner correctly points out that in this transaction, unlike the first transaction, he did not control the selling corporation. However, as was the case in the first transaction, petitioner again agreed to pay a price in excess of fair market value. Respondent advances several *512 reasons why we should deny petitioner's claimed interest deduction. Respondent relies first on the recent decision of the Court of Appeals for the Ninth Circuit in Estate of Franklin v. Commissioner,544 F. 2d 1045 (9th Cir. 1976). In Estate of Franklin the Court of Appeals affirmed, for different reasons, a decision of this Court (64 T.C. 752 (1975)) disallowing interest and depreciation deductions arising from a limited partnership's purchase of a motel. The "purchase" in Estate of Franklin required only the payment of $75,000 prepaid interest; no other cash was due to change hands until the nonrecourse note became due ten years later. Furthermore, the motel was leased back to its former owners. Concerning the claimed interest deduction, the Court of Appeals held that the debt had only potential existence due to the absence of personal liability. The purchasers would pay only if the property appreciated significantly in value. The court stated that "the absence of personal liability on the debt reduces the transaction in economic terms to a mere chance that a genuine debt obligation may arise. This is not enough to justify an interest *513 deduction." 544 F. 2d at 1049. Respondent contends that Estate of Franklin controls this issue in this case. We need not decide, however, whether Estate of Franklin controls this situation, since we find other support for respondent's determination. We conclude on all the facts that petitioner's $30,000 payment is better characterized as payment for an option to acquire the property than as interest. Viewed as what it purports to be, the transaction simply fails to bear the earmarks of commercial reality. The $300,000 "purchase price" was grossly in excess of both recent cost to EPI ($129,000) and appraised fair market value ($136,000). The $210,000 "debt" to EPI was so readily "forgiven" that we cannot find it was a genuine debt in the first place. Evidentially it served primarily as the vehicle for swelling the "purchase price" to the point where one year's prepaid interest would equal the desired deduction of $30,000. (Prepaid interest in excess of one year would have fallen afoul of Rev. Rul. 68-643, 1968-2 C.B. 76.) And yet presumably petitioner expected to get something for his $30,000 outlay. It was testified that successful development *514 would have increased the value of the land to $600,000. However, Clardy's "Investment Plan" underlined the speculative character of prospects for the land: * * * The land is a different story. Its future is uncertain and suffice it to say that only the future will dictate what should be done. However, I want to point out that even if the land investment proves ill advised the houses should provide a source of capital recovery. Such a viewpoint by Clardy comports poorly with his "loan" of $210,000 to petitioner with the apparent express or tacit understanding that petitioner would be called upon to pay only if successful development of the land occurred. Viewed as a "down payment" for a $300,000 deed, the $30,000 prepaid interest clearly falls short of commercial reality. Viewed as a part (22 percent) of the fair market value of the land, $30,000 looks larger. However, petitioner intended and expected that the $30,000 would be deductible, so that the projected after-tax cost of the $30,000 would be small in relation to the land's value. Viewing the entire transaction, we cannot escape the conclusion that no bona fide purchase of the land took place. Petitioner simply *515 took a flyer on land with substantial upside possibilities and considerable risk. For the after-tax portion of $30,000, he bargained to participate in the fruits of any development in excess of $300,000. In substance and effect, the $30,000 purchased merely an option on the property. The cost of an option is not deductible. On this basis, petitioner's claimed interest deduction in this transaction is disallowed. 3. Various Business Deductions.
The final issue is whether petitioner is entitled to deduct $6,483.57 for various business and entertainment expenditures. Respondent contends that petitioner has not sufficiently substantiated the claimed deductions; petitioner claims that the testimony at trial was sufficient to support the claimed deductions. The burden of proof is on petitioner. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
For claimed deductions for dues and subscriptions, utilities and laundry, petitioner presented no substantiation of the expenditures and conceded that the amounts of the deductions *516 were merely estimates made by his accountant. Respondent allowed petitioner a portion of these claimed deductions, and petitioner has not established that he is entitled to more. Accordingly, as to these items, respondent's determinations are sustained. Petitioner also claimed a deduction for entertainment expenditures (listed as conventions and meetings and promotional expenses) of $7,030, of which respondent allowed only $792.91. The deductibility of entertainment expenditures is determined by section 274 and the regulations thereunder. While expenditures for business meals do not have to satisfy the requirements of section 274(a), to deduct these expenditures petitioner must nonetheless satisfy the substantiation requirements of section 274(d). Cf. section 274(e)(1); sections 1.274-2(f)(2)(i) and 1.274-5, Income Tax Regs.Section 274(d) provides that no deduction is allowed for these types of expenditures "unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating *517 his own statement" the time, place, amount and business nature of the expenditure. Respondent's regulations provide a two-part test to determine if records are "adequate." First, the taxpayer must maintain an account book or diary in which the amount, time, place and business purpose of expenditure is recorded. The record must be prepared at or near the time of the expenditure. Second, documentary evidence, such as receipts, is required for any expenditure for lodging while away from home or any other expenditure, except transportation charges, exceeding $25. To satisfy these requirements, petitioner has submitted a diary but no documentary evidence. In this diary petitioner has recorded all of his business entertainment expenditures during 1971; the total amount of the expenditures listed in the diary is $4,666.59. Since petitioner produced no documentary evidence, we conclude, first, that no deduction can be allowed for expenses in excess of $25. For expenses under $25, for which documentary evidence is not required by the regulations, we have carefully examined petitioner's diary to determine the business purpose of each expenditure. In making this determination, we have kept *518 in mind the provision in the regulations that "the degree of substantiation necessary to establish business purpose will vary depending upon the facts and circumstances of each case." We have found a business purpose for expenditures totaling $1,451.71. For the remainder of the expenditures under $25 we could not determine, to our satisfaction, the business purpose of the expenditures. Accordingly, petitioner is entitled to a deduction for entertainment expenditures of $1,451.71. [6]
Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect in 1971. Respondent has conceded the addition to tax.↩
2. Petitioner was not aware of the amount EPI had paid for the land. ↩
3. EPI returned the $210,000 cash it received from petitioner to Clardy or his wholly-owned corporation, and used the remaining cash to pay off the prior owners of the property. ↩
4. Mr. Clardy testified as follows concerning the $210,000: * * * With regard to the $210,000 it was a system of check swapping that we'd been advised to do by our accountants. The lending institution, Great Western Savings and Loan Association, had told us that they didn't want a second deed of trust of record against the property at the time they made their first loan. Implicit in that was that they wanted the escrow instructions when Dr. Young purchased the property to show that he paid cash to a $90,000 loan. I simply set up the sale to Dr. Young, in one escrow as cash to a $90,000 loan and set up the second escrow in which I agreed to loan him $210,000. I evidenced the $210,000 loan in the form of a $300,000 wrap around, which is $210,000 plus the $90,000 loaned by Great Western. The checks in and out as to the $210,000 is that we collected $210,000 from the title company in one escrow into the trust account and paid $210,000 to the title company out of the same trust account on the same day and cleared the checks, thereby documenting the loan and thereby documenting the sale of cash to the loan for Dr. Young. We recorded the second deed of trust then, subsequent to the making of the first loan by Great Western and the books were right and we went on down the road.↩
4a. Respondent in his statutory notice computed the adjustment for dues and subscriptions as shown above. The adjustment should be $79.75.↩
5. The law was changed by the Tax Reform Act of 1976, which provides that prepaid interest "shall be treated as paid in the period" with respect to which the interest represents a charge for the use or forebearance of money. Section 461(g), added by section 208(a) of Public Law 94-455, October 4, 1976.↩
6. Respondent allowed petitioner a business expense deduction for entertainment of only $792.91.↩