JOSEPH W. KAEMPFER, JR. AND JEAN P. KAEMPFER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kaempfer v. Commissioner
Docket No. 30285-89
United States Tax Court
T.C. Memo 1992-19; 1992 Tax Ct. Memo LEXIS 24; 63 T.C.M. (CCH) 1765; T.C.M. (RIA) 92019; January 8, 1992, Filed *24 Decision will be entered for respondent. John M. Bryan, for petitioners. Warren P. Simonsen, and Michael B. Frosch, for respondent. PARKER, Judge. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a deficiency of $ 26,943.59 in petitioners' 1978 Federal income tax. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the period at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. The issue for decision is whether to treat as interest under section 163 the amount designated as the increase per day in the Assigned Value of property identified for a like-kind exchange under section 1031. FINDINGS OF FACT All of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners Joseph W. Kaempfer, Jr., and Jean P. Kaempfer were married, filing a joint return, during the period at issue. Petitioners have since divorced. At the time they filed their petition, Joseph W. Kaempfer, Jr., lived in Washington D.C., and Jean P. Kaempfer lived in Barnesville, *25 Maryland. Jean P. Kaempfer did not participate in the business transaction that is involved in this lawsuit. All references to petitioner in the singular will be to Joseph W. Kaempfer, Jr. Phelps Realty Company, Inc. (hereinafter Phelps Realty) owned a certain parcel of real property in the Rosslyn section of Arlington, Virginia (hereinafter the Subject Property). Petitioner wished to acquire the Subject Property in order to grant Arlington County an easement for public park purposes in exchange for additional development rights (greater density) relating to construction of an office building on another parcel of land also located in Rosslyn. Phelps Realty wanted to exchange the Subject Property with petitioner for another property so that the transfer would qualify for nonrecognition treatment under section 1031. On October 29, 1979, petitioner and Phelps Realty entered into a Real Estate Exchange Agreement (the Initial Agreement). Under this agreement, petitioner was to acquire property designated by Phelps Realty and thereafter exchange that property (the Exchange Property) for the Subject Property. In the Initial Agreement the parties agreed that the fair market value *26 of the Subject Property was $ 500,000. At the time the agreement was executed, petitioner deposited $ 25,000 with Chicago Title Insurance Company, the escrow agent. The Initial Agreement provided that, in the event of petitioner's default, the deposit -- shall be paid to Phelps as agreed upon liquidated damages, whereupon this Agreement shall terminate and the parties hereto shall be released from any further liability or obligation to each other, it being expressly understood that the payment of Kaempfer's deposit to Phelps shall be Phelps' sole and exclusive right and remedy.
In the event of default by Phelps Realty, petitioner "shall have such rights and remedies as shall be provided by law (including the right to obtain specific performance of this Agreement)." The Initial Agreement provided that the closing date would be 240 days after full contract ratification. Phelps Realty reserved the right to extend the closing date for an additional 120 days. As a result, the original closing date (without any extension) was June 25, 1980. On May 3, 1980, petitioner and Phelps Realty entered into a Real Estate Exchange Agreement (hereinafter the Modified Agreement), effective *27 as of October 30, 1979, which restated the Initial Agreement and which modified some of the terms of the Initial Agreement. Paragraph 4 of the Modified Agreement, for example, provided: 4. Assigned Value. For all purposes under this Agreement the value assigned to the Property (hereinafter referred to as the "Assigned Value") is the sum of five hundred seventeen thousand five hundred dollars ($ 517,500), plus two hundred and fifty dollars ($ 250.00) per day for each day that closing is delayed beyond June 29, 1980.
Two hundred fifty dollars per day would approximate an interest rate of 17.5 percent on $ 517,500. On October 30, 1979, the prime interest rate was 15.25 percent and on May 2, 1980, it was 18.5 percent. Upon execution of the Modified Agreement, petitioner deposited an additional $ 25,000 with the escrow agent, such deposit and any interest thereon to be applied to the purchase price at closing. Thus, as of May 3, 1980, the aggregate deposit posted by petitioner was $ 50,000. Phelps Realty assumed the risk of all loss or damage to the Subject Property until the closing date. In the event of condemnation of the Subject Property before the closing date, *28 all proceeds of condemnation would be the sole property of Phelps Realty and the entire deposit would be returned to petitioner. At the time the Modified Agreement was executed, the Subject Property had a tenant operating an open-air parking lot thereon, and on the closing date Phelps Realty was to assign to petitioner any remaining rights it had against the tenant. Also, any rental on the Subject Property was to be adjusted between Phelps Realty and petitioner as of the closing date. Similarly, all property taxes, water and sewer changes, and similar items, as well as the rent, were to be apportioned between Phelps Realty and petitioner at closing as of the closing date. The closing date was set for June 29, 1980, but petitioner rather than Phelps Realty could "extend the Closing Date for up to three hundred and sixty five (365) days, subject to the adjustment of Assigned Value * * *" and subject to Phelps Realty's right to require closing at any time after December 29, 1980, if it had located a suitable Exchange Property by that time. Either Phelps Realty or petitioner had to provide 30 days' notice of intent to close. On May 29, 1980, [1] petitioner and Phelps Realty amended *29 the Modified Agreement to give petitioner the right to extend the closing date for "up to five hundred forty-seven (547) days, subject to the adjustment of the assigned value, specified in Section 4 * * *" and subject to Phelps Realty's right to require closing at any time after December 29, 1980, should it locate a suitable Exchange Property and subject to 30 days' notice. This amendment also provided that after the tenant's lease expired on June 30, 1981, Phelps Realty could continue to lease the Subject Property to the parking lot operator, but only on a month-to-month basis. If the tenant was occupying the Subject Property at closing, any rental was to be adjusted between Phelps Realty and petitioner as of the closing date. This amendment also added the following paragraph to the Modified Agreement: Upon the execution of this Amendment, Kaempfer shall increase the deposit by delivering to Chicago Title Insurance Company, a promissory note to Phelps, in the form annexed hereto in the amount of Forty Thousand Dollars ($ 40,000.). In the event Kaempfer shall fail to close in accordance with the terms hereof, such note shall be due and payable, and in the event of a default *30 in payment thereof, such note shall bear interest at the rate of twelve percent (12%) per annum. At closing, or upon default by Phelps, the note shall be returned to Kaempfer.
The provisions for default under the Modified Agreement were as follows: In the event that Phelps makes full tender of performance under this Agreement and Kaempfer fails to complete Closing as specified hereinabove, the entire deposit aforesaid and all interest thereon shall be paid to and shall be the property of Phelps and no party shall have any further claim or right against any other party under this Agreement. In the event that Kaempfer makes full tender of performance under this Agreement and Phelps fails to complete Closing as specified hereinabove, Kaempfer shall have the right to obtain specific performance of this Agreement, but should Kaempfer *31 not initiate legal proceedings therefor within six (6) months from the Closing Date or the date of Kaempfer's complete tender of performance, whichever is earlier, then Kaempfer's sole remedy hereunder shall be return of the deposit aforesaid with all interest thereon to Kaempfer, and no party shall have any further claim or right against any other party under this Agreement.
Under the Modified Agreement, petitioner would create the trust (hereinafter "the Trust") at the request of Phelps Realty at or prior to the closing date to effect the exchange. Petitioner was to cause the Trustee "as his agent" to arrange for transfer of the Exchange Property to Phelps Realty. The creation of the Trust was "for the sole purposes of receiving a deed to the [Subject] Property and delivering it to Kaempfer upon the Trustee's receipt of a cash payment equal to the Assigned Value of the [Subject] Property." The Modified Agreement further provided: On the Closing Date, Phelps shall deliver a deed to the [Subject] Property to the Trustee, and Kaempfer will deposit with the Trustee the Assigned Value of the [Subject] Property. The moneys constituting the Assigned Value will constitute *32 the Trust Estate which will be disbursed by the Trustee to fund the cost of acquiring the Exchange Property. * * * During the term of this Agreement and the duration of the Trust, Phelps shall have the right to locate and negotiate the terms of purchase for the Exchange Property. At the request of Phelps, Kaempfer will then cause the Trustee to arrange for the transfer of the designated Exchange Property to Phelps on behalf of Kaempfer. * * * The Assigned Value plus any income earned on the investment thereof shall be held by the Trustee as part of the Trust Estate. * * * * * * f. All earnings on the Assigned Value of the [Subject] Property while held by the Trustee shall be useable for paying acquisition and conveyancing costs of the Exchange Property, related expenses, and any proper charges of or levied against the Trustee or the Trust Estate. g. Phelps may elect, at any time prior to June 28, 1984, to treat the conveyance to Kaempfer as a sale and terminate the Trust, in which event all funds in such Trust shall be immediately paid to Phelps.
The latest date for the closing on any Exchange Property was June 28, 1984, but at any time prior to that date Phelps Realty *33 could elect to treat the conveyance to petitioner as a sale, terminate the Trust, and be paid all funds in the Trust. However, no such Trust was ever created. February 14, 1980, was the date of formation of Park Place Associates (hereinafter Park Place), a limited partnership in which petitioner was a general partner. On that date, petitioner assigned to Park Place his rights under the Modified Agreement. The Modified Agreement granted petitioner the right to submit applications for zoning, planning, site planning, and permit procedures with respect to the Subject Property. The Modified Agreement further provided that Phelps Realty would cooperate with petitioner in these applications, but that the "same shall be at the sole cost, expense, and risk of Kaempfer". Between January 1, 1981, and October 31, 1981, Park Place spent more than $ 670,000 in developing the office building in Rosslyn, referred to above. A small portion of the $ 670,000 was for legal fees and site plan approval expenses incurred in connection with the transfer of density rights from the Subject Property to that office building. On November 2, 1981, pursuant to direction from Phelps Realty, petitioner purchased *34 real property in Clearwater, Florida (the Exchange Property), for the purpose of effectuating the like-kind exchange. The purchase price of this property was $ 620,000. On the same day, petitioner transferred the Exchange Property to Phelps Realty and, pursuant to the terms of the Modified Agreement, Phelps Realty transferred its interest in the Subject Property to Park Place. The settlement closing sheet indicates that the "contract sales price" for the Subject Property was $ 640,250, $ 614,359.50 of which was the value placed on the Clearwater Exchange Property, and $ 25,890.50 were settlement charges to Phelps Realty that were paid by Park Place. Since the closing date of November 2, 1981, was 491 days after June 29, 1980, the "contract sales price" of the Subject Property was computed by adding $ 517,500 plus 491 days times $ 250 per day ($ 122,750), as provided in the Modified Agreement. The deed recording the transfer of the Subject Property from Phelps Realty to Park Place showed a consideration of $ 640,250, and various taxes were based on that amount. The State tax of $ 960.45 and the county transfer tax of $ 320.15, both based on a consideration of $ 640,250, were *35 paid by Park Place. The grantor's State recording tax of $ 640.50, based upon a consideration of $ 640,250, was a charge to Phelps Realty, but was actually paid by Park Place. Phelps Realty reported the transfer as a like-kind exchange on its corporate tax return. Phelps Realty recognized no gain or loss and did not treat any portion of the $ 640,250 consideration as interest income. Park Place, on its partnership tax return, treated the amount of consideration in excess of $ 517,500 as interest expense. Of the $ 122,750 excess, Park Place allocated $ 99,250 to interest and $ 23,500 to construction period interest subject to amortization. Petitioner's distributive share of these items was $ 60,635 for the interest and $ 1,596 for the construction period interest. Petitioner deducted his distributive share of these items on his 1981 Federal income tax return and applied the excess against his 1978 taxable income as a net operating loss carryback. In the statutory notice of deficiency, respondent disallowed the $ 60,635 in interest and the $ 1,596 in construction period interest. Respondent made adjustments to petitioner's income by recalculating his distributive share of (a) *36 Park Place's ordinary loss for the 1981 interest expense and (b) the allowable portion of constructive period interest in 1981. Respondent determined a deficiency of $ 26,943.59 for 1978 based upon this recalculation. OPINION Section 163(a) provides: "There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." In order to come within section 163(a), the following four requirements must be met. There is a genuine indebtedness. Knetsch v. United States, 364 U.S. 361, 365 (1960); Coleman v. Commissioner, 87 T.C. 178, 209 (1986), affd. without published opinion 833 F.2d 303 (3d Cir. 1987). The indebtedness is that of the taxpayer. Abdalla v. Commissioner, 69 T.C. 697, 707 (1978). The payment is of interest. Juda v. Commissioner, 90 T.C. 1263, 1288-1289 (1988), affd. 877 F.2d 1075 (1st Cir. 1989). The interest deduction is claimed in the proper year based on the taxpayer's method of accounting. Helvering v. Price, 309 U.S. 409, 413 (1940); James Brothers Coal Co. v. Commissioner, 41 T.C. 917, 922 (1964). *37 See Midkiff v. Commissioner, 96 T.C. 724, 734 (1991). See also Commissioner v. Philadelphia Transportation Co., 174 F.2d 255 (3d Cir. 1949), affg. 9 T.C. 1018 (1947), affd. 338 U.S. 883 (1949). Moreover, economic realities, not the form of the transaction, govern the characterization of the payment or accrual. Titcher v. Commissioner, 57 T.C. 315, 322 (1971). Although an indebtedness is an obligation, an obligation is not necessarily an indebtedness within the meaning of section 163(a). Deputy v. Du Pont, 308 U.S. 488, 497 (1940). An indebtedness is "an existing, unconditional, and legally enforceable obligation for the payment of a principal sum." Midkiff v. Commissioner, 96 T.C. at 734-735 (citing Howlett v. Commissioner, 56 T.C. 951, 960 (1971)); Jordan v. Commissioner, 60 T.C. 872, 881 (1973), affd. 514 F.2d 1209 (8th Cir. 1975); Williams v. Commissioner, 47 T.C. 689, 692 (1967), affd. 409 F.2d 1361 (6th Cir. 1968). Interest is compensation for the *38 use or forbearance of money. Deputy v. Du Pont, 308 U.S. at 497; Old Colony Railroad v. Commissioner, 284 U.S. 552, 560 (1932). In order for interest to be deductible, it must be on genuine debt. Coleman v. Commissioner, 87 T.C. at 209. Petitioner argues that the purchase price of the Subject Property was fixed at $ 517,500 and that "The Agreement established a definitive closing date at which time Phelps was entitled to be paid the purchase price for the Property." The parties agreed that the Assigned Value would increase daily if the closing date were extended beyond June 29, 1980. Petitioner claims that the $ 250 increase per day was compensation for the economic loss suffered by Phelps Realty due to its inability to invest $ 517,500 at market rates of interest. The obligation was not for a fixed amount until after Phelps Realty identified suitable Exchange Property for the exchange. Once the Exchange Property was identified by Phelps Realty, petitioner had an obligation under the contract to purchase the Exchange Property for the Assigned Value of the Subject Property and then to exchange it for the Subject Property. *39 Respondent's main argument is that there was no existing or legally enforceable indebtedness on which interest could be based. In support of this, he notes that, in the event of petitioner's default, Phelps Realty could not enforce petitioner's obligation, but could only retain the $ 90,000 deposit. Respondent contends that the per diem increase was an approximation of the increase in the value of the Subject Property and labels this increase the "incremental time price differential". Respondent argues that there was no promise to pay a principal amount, only a promise to exchange property or lose the deposit. For the reasons stated below, we find that there was no legally enforceable obligation on which interest could be based. In Midkiff v. Commissioner, supra, we elaborated on the factors that give rise to a legally enforceable obligation. In that case, the taxpayers argued that an obligation arose as of the date on which the lot they were leasing was designated for acquisition by eminent domain by the Hawaii Housing Authority (HHA), pursuant to the Hawaii Land Reform Act of 1967. HHA brought condemnation proceedings against the lessor estate pursuant *40 to the request of the taxpayers. Midkiff v. Commissioner, 96 T.C. at 726. In addition to submitting $ 500 in earnest money to secure their obligation and proof of financial ability to purchase the leased fee, the taxpayers had to submit a written commitment to acquire the leased fee upon acquisition by the HHA. In the event that the taxpayers withdrew their lot from the acquisition process, they were required to pay their pro rata share of costs and to forfeit their $ 500 earnest money deposit. Midkiff v. Commissioner, 96 T.C. at 727. In April 1986, five years after the condemnation action in Midkiff was brought, the parties entered into a settlement agreement which provided that the lessor estate would receive, inter alia, (1) the value of the leased fee as of the date of designation by the HHA and (2) five percent per year on that value from the date of designation to the date of closing. Midkiff v. Commissioner, 96 T.C. at 731. Pursuant to the terms of the settlement, the lessor estate submitted to the taxpayers an offer to sell the fee interest. In August 1986, the taxpayers accepted the lessor estate's offer *41 and, in November 1986, received legal title to the property. The taxpayers deducted the five percent "interest" payment from their Federal income taxes for 1986. Midkiff v. Commissioner, 96 T.C. at 733-734. We found that the taxpayers were not unconditionally obligated to pay just compensation to the lessor estate until they affirmatively executed the reply to the estate's offer to sell, indicating their intent to purchase the lot, and escrow closed on the purchase. That is, * * * [the taxpayers] were not obligated for the payment of a principal sum until the date that escrow closed on the purchase.
Midkiff v. Commissioner, 96 T.C. at 737. As petitioner does in this case, the taxpayers in Midkiff relied on Dunlap v. Commissioner, 74 T.C. 1377 (1980), revd. on other grounds 670 F.2d 785 (8th Cir. 1982), in support of their argument that even if the indebtedness did not become unconditional until the date of closing, it was a "'sufficient obligation upon which deductible interest could ultimately accrue.'" Midkiff v. Commissioner, 96 T.C. at 737. In Dunlap, we held *42 that the fact that indebtedness was materially conditional during the period of interest accrual did not preclude a deduction for interest paid with respect to such period after the debt became unconditional. Dunlap v. Commissioner, 74 T.C. at 1423, 1424. Dunlap involved the purchase of a savings bank. The debt did not become unconditional unless and until the transaction was approved by the Federal Reserve Board. In the case before us, as in Midkiff v. Commissioner, supra, the date that the contract became unconditional was wholly within the control of the parties to the contract. In Midkiff, we distinguished Dunlap on the basis that whether and when the debt became unconditional was within the control of a third party. In this case, * * * [the taxpayers] had the opportunity to choose not to purchase the leased fee interest in their lot at any time up to, and until, the date of closing. Thus, whether * * * [the taxpayers'] obligation to purchase the leased fee interest became unconditional was wholly within the control of * * * [the taxpayers]. This is a significant distinction from Dunlap v. Commissioner, supra, *43 and Journal Co. v. Commissioner, [125 F.2d 349 (7th Cir. 1942), revg. 44 B.T.A. 460 (1941)], where the agreements were subject to the approval of the F.R.B. and a State probate court, respectively, and in each instance without the control of the taxpayer.
Midkiff v. Commissioner, 96 T.C. at 739. Here respondent argues that no debtor/creditor relationship was created and that there was no obligation until closing, at which time the incremental amount merged into the Assigned Value of the Subject Property. [2] Furthermore, respondent argues, there was no loan of $ 517,500. The Modified Agreement defined the "Assigned Value" as $ 517,500 plus $ 250 per day. [3] We agree that no debtor/creditor relationship existed prior to closing. *44 We find that Phelps Realty never had a legally enforceable right to receive $ 517,500. Under the provisions of the Modified Agreement, Phelps Realty was not entitled to receive $ 517,500. It was at the insistence of Phelps Realty, and for its sole benefit, that the transaction was structured as an exchange rather than a purchase and sale. Phelps Realty did, however, have the ability to transform the exchange into a taxable sale of the Subject Property if it first directed petitioner to create the Trust. In that case, petitioner would deposit the Assigned Value of the Subject Property with the trustee. If Phelps Realty elected to treat the transaction as a sale, it would be entitled to all funds in the Trust -- i.e., the Assigned Value plus any earnings on that amount. In that situation, the "purchase price" would have been the amount of money deposited by petitioner into the Trust -- the Assigned Value on the date the Trust was created. That never happened, and no such Trust was ever created. In the event of petitioner's default, Phelps Realty could not enforce payment of $ 517,500 or any other amount; it was only entitled to liquidated damages in the amount of the deposit *45 ($ 90,000) and any interest thereon. Although it might have been an imprudent business decision for petitioner simply to walk away from the land transaction and forfeit his $ 90,000 deposit, that factor alone does not create a legally enforceable obligation for the payment of any amount. It is axiomatic that interest is compensation paid for the use or forbearance of money. Until the actual closing date, however, Phelps Realty had given up neither the use of its money nor the Subject Property. Thus, we note that the transaction in the present case is fundamentally distinguishable from the classic deferred exchange situation addressed in Starker v. United States, 602 F.2d 1341 (9th Cir. 1979), and in the income tax regulations promulgated in 1991. Starker involved a "land exchange agreement" whereby Starker transferred timberland to Crown Zellerbach with the agreement that Crown Zellerbach would transfer suitable real property to Starker within five years or pay any outstanding balance in cash. Crown Zellerbach agreed to add a six percent annual "growth factor" to the outstanding balance. Starker v. United States, 602 F.2d at 1342-1343. *46 The United States contended that the "growth factor" was really compensation for the use or forbearance of money. Starker argued that the "growth factor" was compensation for timber growth on the property he had transferred to Crown Zellerbach. The court, agreeing with the United States, stated: The taxpayer is essentially arguing "that he conveyed $ 1,502,500 to a stranger for an indefinite period of time [up to five years] without any interest." The 6 per cent "growth factor" was "compensation for the use or forbearance of money", that is, for the use of the unpaid amounts owed to Starker by Crown. Therefore, it was disguised interest.
Starker v. United States, 602 F.2d at 1356 (citations omitted). In the case before us, we are not faced with a Starker-type deferred exchange. [4] Phelps Realty did not transfer the Subject Property to petitioner and then subsequently receive other property. The Modified Agreement specifically provided that "On the Closing Date, * * * Phelps shall exchange the [Subject] Property to and with * * * [petitioner] for other real property acceptable to Phelps." In both Starker and section 1.1031(k)-1, Income Tax Regs., *47 a party to the exchange has given up property before the other property in the exchange is transferred. Neither applies to simultaneous exchanges of property. In this case, the parties to the land transaction contracted for a simultaneous exchange of property. In this case, the parties to the land transaction contracted for a simultaneous exchange of property in the future, not a deferred exchange. Because the exchange was to be simultaneous, Phelps Realty did not give up the Subject Property before receiving the Exchange Property in return. Phelps Realty assumed the risk of loss of the Subject Property until the closing date. In fact, all benefits and burdens of ownership of the Subject Property remained with Phelps Realty until the closing date. The Subject Property was rented to a parking lot operator which paid the rent to Phelps Realty until the closing date. Had the Subject Property been condemned before the closing date, all of the proceeds of condemnation would have belonged to Phelps Realty, and petitioner would merely have received the return of his deposit. At the closing all items of taxes, expenses, and rent for the Subject Property were allocated between Phelps *48 Realty and petitioner as of the closing date. All of this and the transfer of the Subject Property to petitioner occurred simultaneously with the transfer of the Exchange Property to Phelps Realty. Thus, Starker v. United States, supra, is not helpful to petitioner in this case. *49 Although labels given by the parties to the land transaction are not controlling, the intent of the parties is relevant to the determination of whether an amount is to be treated as interest. Dunlap v. Commissioner, 74 T.C. at 1421. In the present case, the Modified Agreement in several instances refers to "interest" on money deposited by petitioner and "interest" on the funds transferred to any trust. It is, however, silent and does not label the $ 250 per diem amount as "interest." The Modified Agreement in fact defined the Assigned Value of the Subject Property as including this amount. Moreover, we note that Phelps Realty did not report the $ 250 per day increase as interest income, [5] as would have been required by section 1031(b) and section 1.1031(b)-1(a)(1), Income Tax Regs.
In conclusion, we find that there was no legally enforceable obligation *50 to which the $ 250 per day increase could attach. If there were such an obligation, our holding in Midkiff v. Commissioner, supra, would preclude its deductibility because whether and when any such obligation became unconditional was solely within the control of the parties to the land transaction. The incremental amount was not a payment for the use or forbearance of money. The actions of the parties to the land transaction indicate that they did not intend the amount to be interest. We hold that the $ 250 per day increase is part of the purchase price of the Subject Property and is included in the basis of the property acquired by petitioner. We thus hold that no portion of this amount is deductible as interest under section 163(a). To reflect the foregoing, Decision will be entered for respondent. Footnotes
1. This amendment states that is was executed on May 29, 1981, but the parties have stipulated that the date was 1980. Given the terms of the amendment, 1980 is clearly the correct date.↩
2. Respondent contends that the $ 250 per day increase was meant to approximate the daily increase in the value of the Subject Property. We find nothing in the record, however, that indicates what the actual or projected change in property values for the Arlington, Virginia, area was during the period in question. It is sufficient to say that the increase was not interest and that it must be capitalized. ↩
3. Respondent notes that if the per diem charge were in fact interest, Phelps Realty would not have been entitled to nonrecognition on this portion. Sec. 1031(b); sec. 1.1031(b)-1(a)(1), Income Tax Regs.↩ The treatment by Phelps Realty of the per diem amount may be indicative of the parties' intent, but is not a controlling factor.
4. See also section 1.1031(k)-1(h), Income Tax Regs., promulgated in 1991, which provides: (1) In general. For purposes of this section, the taxpayer is treated as being entitled to receive interest or a growth factor with respect to a deferred exchange if the amount of money or property the taxpayer is entitled to receive depends upon the length of time elapsed between transfer of the relinquished property and receipt of the replacement property. (2) Treatment as interest. If, as part of a deferred exchange, the taxpayer receives interest or a growth factor, the interest or growth factor will be treated as interest, regardless of whether it is paid to the taxpayer in cash or in property (including property of a like kind). The taxpayer must include the interest or growth factor in income according to the taxpayer's method of accounting.
Section 1.1031(k)-1(a), Income Tax Regs., provides: For the purposes of section 1031 and this section, a deferred exchange is defined as an exchange in which, pursuant to an agreement, the taxpayer transfers property held for productive use in a trade or business or for investment (the "relinquished property") and subsequently receives property to be held either for productive use in a trade or business or for investment (the "replacement property").
These regulations only apply to exchanges taking place after June 10, 1991. Sec. 1.1031(k)-1(o), Income Tax Regs.↩
5. Young v. Commissioner, T.C. Memo. 1978-19, 37 T.C.M. 131↩, 134, 47 P-H Memo T.C. par. 78,019 at 140.