Warren E. HALLE; Martha D. Halle, Partners Other Than the Tax Matters Partner, Petitioners–Appellants,

and

Kingstowne L. P., Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 95–1740.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 30, 1995.

Decided May 6, 1996.

**ARGUED:** Patrick G. Dooher, Silverstein & Mullens, Washington, D.C., for Appellants. Jonathan Samuel Cohen, Tax Division, United States Department of Justice, Washington, D.C., for Appellee. **ON BRIEF:** Loretta C. Argrett, Assistant Attorney General, Gary R. Allen, Kevin M. Brown, Tax Division, United States Department of Justice, Washington, D.C., for Appellee.

Before NIEMEYER and MICHAEL, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

## OPINION

NIEMEYER, Circuit Judge:

We are presented with the question of whether the taxpayer may deduct as interest under I.R.C. § 163(a) $900,000 in payments it made to defer the closing date of a stock purchase agreement that obligated it to buy all of a corporation's capital stock. Because the stock purchase agreement contained a liquidated damages clause limiting the taxpayer's liability on default, the Commissioner of Internal Revenue concluded that the agreement did not impose indebtedness on the taxpayer for the full purchase price and that, therefore, the $900,000 paid to defer settlement did not constitute interest on indebtedness within the meaning of I.R.C. § 163(a). The United States Tax Court sustained the Commissioner's disallowance of the claimed interest deduction.

Based on our conclusions that (1) the stock purchase agreement created indebtedness for the full purchase price and (2) the payments made to defer the settlement date compensated the selling stockholders for their forbearance of the purchase price, we hold that the payments are deductible as interest under I.R.C. § 163(a). Accordingly, we reverse the Tax Court's decision.

### I

Warren E. Halle, who is in the business of land development and home construction, discovered an 1,100–acre tract of land in Fairfax County, Virginia, which he believed was suitable for residential development. During the summer of 1984, Halle began negotiations with the four shareholders of Greendale Development Company, Inc., the Virginia corporation that owned the 1,100–acre tract. When the parties reached agreement, Halle formed Kingstowne L.P., a limited partnership, to purchase all of Greendale's stock for $29 million because the 1,100–acre tract was Greendale's only asset. Halle appointed one of his companies to be Kingstowne's general partner and he and his wife,

Martha Halle, became Kingstowne's limited partners.

On March 8, 1985, Kingstowne and Greendale's four stockholders entered into a Stock Purchase Agreement, which provided that "Seller hereby agrees to sell to Buyer, and Buyer agrees to purchase from Seller on the Settlement Date all of the issued and outstanding capital stock" of Greendale for $29 million. The agreement required Kingstowne to pay a $3 million deposit and the balance at settlement. The agreement established April 26, 1985, as the settlement date, but permitted Kingstowne to defer settlement up to October 1, 1985, by paying the Greendale stockholders $225,000 per month, to be adjusted on a daily basis.

When the Stock Purchase Agreement was executed, Greendale was in the final stages of obtaining rezoning from Fairfax County to allow higher density development of the land. Accordingly, the agreement required Greendale to transfer all engineering and planning for the property to Kingstowne and to bear the continuing costs of "engineering, planning, and development incurred through March 15, 1985." Thereafter, Kingstowne unconditionally assumed the obligation to pay all such costs "when due."

Finally, the contract provided that in the event of Kingstowne's default in "mak[ing] settlement . . . or mak[ing] the required payment[s]" to extend the settlement date, the $3 million downpayment and any monthly installments already paid to defer the settlement date "shall be forfeited to Seller as liquidated damages." The default clause also provided that "the parties shall have no further rights or liabilities one to the other hereunder."

As required by the Stock Purchase Agreement, Kingstowne paid the $3 million downpayment to the Greendale stockholders when the agreement was executed, and it assumed the engineering, planning, and development costs of the property, eventually paying $506,779 in such costs as they accrued. Kingstowne also elected to defer settlement for four months, paying the sellers a total of $900,000 for the extension.

During the period between the execution of the Stock Purchase Agreement and settlement, Kingstowne applied for and obtained $53 million in loan commitments to finance the purchase and development of the land. It also began negotiations to sell portions of the tract and to enter into joint development ventures with third parties, exchanging preliminary drafts which could not be finalized until after settlement. In June 1985, the Fairfax County Board of Supervisors approved the rezoning of the land tract as anticipated.

On August 23, 1985, the parties settled in accordance with the terms of their Stock Purchase Agreement. Immediately after consummating the transaction, Kingstowne liquidated Greendale and assumed direct ownership of the 1,100–acre tract.

In its 1985 income tax return, Kingstowne treated the $900,000 it had paid to defer the settlement date of the Stock Purchase Agreement as deductible interest paid on the stock's purchase price. Kingstowne later sent a Form 1099–MISC to the selling stockholders of Greendale, reporting the $900,000 as miscellaneous compensation. The sellers, however, objected to Kingstowne's issuance of the form and opted to treat the fees as additional proceeds from the sale of their stock. After an examination of Kingstowne's tax return, the Commissioner issued a Notice of Final Partnership Administrative Adjustment that disallowed Kingstowne's claimed $900,000 interest deduction, which had been passed through to the partners (Halle, his corporation, and his wife).

In January 1993, Kingstowne and the Halles filed a petition in the United States Tax Court for a readjustment of partnership items. They argued that "the Commissioner should not have disallowed as interest the $900,000 paid by [Kingstowne] to defer its obligation to pay $29,000,000 purchase price during the taxable year ending September 30, 1985."

On December 22, 1994, the Tax Court denied the petition. The court initially observed that the March 8 Stock Purchase Agreement never described the monthly settlement deferment payments as "interest." The court found, moreover, that the monthly payments had not been paid on "indebtedness" because the Stock Purchase Agreement's liquidated damages clause provided that in the event of its default Kingstowne would forfeit only its $3 million deposit and any settlement deferment payments it had made. Rather than having been made "pursuant to an unconditional and legally enforceable obligation" to pay the balance of the $29 million purchase price, the $900,000 in settlement deferment payments appeared to the court to resemble amounts paid to retain the "option to complete or not complete the transaction."

This appeal was taken from the Tax Court's decision.

## II

■ Section 163(a) of the Internal Revenue Code allows a deduction for "all interest paid or accrued within the taxable year on indebtedness." Because "deductions are a matter of legislative grace," Kingstowne bears the burden of demonstrating that its claimed interest deduction falls within the scope of § 163(a). *See Midkiff v. Commissioner*, 96 T.C. 724, 747, 1991 WL 83269 (1991) (citing *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440, 54 S.Ct. 788, 790–91, 78 L.Ed. 1348 (1934)), *aff'd sub nom. Noguchi v. Commissioner*, 992 F.2d 226 (9th Cir. 1993).

Explaining that "interest" is to be given its "usual, ordinary and everyday meaning," *Old Colony R.R. v. Commissioner*, 284 U.S. 552, 561, 52 S.Ct. 211, 214, 76 L.Ed. 484 (1932), the Supreme Court has defined the term as "compensation for the use or forbearance of money." *Deputy v. du Pont*, 308 U.S. 488, 498, 60 S.Ct. 363, 368, 84 L.Ed. 416 (1940) (interpreting predecessor to § 163(a)); *see also Old Colony R.R.*, 284 U.S. at 560, 52 S.Ct. at 213–14 (same). Because the question of whether Kingstowne's settlement deferment payments qualify as "interest" within the meaning of I.R.C. § 163(a) depends in part on whether the March 8 Stock Purchase Agreement created "indebtedness," we begin with the issue of whether the Stock Purchase Agreement imposed indebtedness on Kingstowne.

"[I]ndebtedness" as used in I.R.C. § 163(a) is a term of art; "although an indebtedness is an obligation, an obligation is not necessarily an 'indebtedness'" for tax purposes. *du Pont,* 308 U.S. at 497, 60 S.Ct. at 368. Indebtedness within the meaning of § 163(a) may arise in a variety of circumstances. First, it may stem from "an existing, unconditional, and legally enforceable obligation for the payment of a principal sum." *Howlett v. Commissioner,* 56 T.C. 951, 960, 1971 WL 2506 (1971); *see also Midkiff,* 96 T.C. at 744 ("The general rule of section 163(a) is that interest is deductible only if paid on an existing unconditional obligation"). Second, even if materially conditional, an existing, legally enforceable obligation may still give rise to indebtedness, so long as (1) the contingency on which the obligation rests is beyond the control of the party seeking the interest deduction, (2) the amount of the indebtedness on which the interest accrued was fixed as of the date that the interest began to accrue, and (3) the payor's liability to the payee is primary and direct. *See, e.g., Journal Co. v. Commissioner,* 125 F.2d 349, 350–51 (7th Cir.1942); *Dunlap v. Commissioner,* 74 T.C. 1377, 1424, 1980 WL 4489 (1980), *rev'd on other grounds,* 670 F.2d 785 (8th Cir.1982); *Midkiff,* 96 T.C. at 739–45; *Kaempfer v. Commissioner,* 63 T.C.M. (CCH) 1765, 1769–70, 1992 WL 1415 (1992). Finally, indebtedness may be imposed on the purchaser of property when the "benefits and burdens" of ownership shift before payment. *See Nelson v. Commissioner,* 66 T.C.M. (CCH) 691, 695, 1993 WL 347412 (1993); *Estate of Franklin v. Commissioner,* 64 T.C. 752, 768–69, 1975 WL 3035, *aff'd,* 544 F.2d 1045 (9th Cir.1976). While Kingstowne advances all three bases for finding indebtedness in this case, we reach only the first of its arguments because it is dispositive.

Kingstowne contends that the March 8 Stock Purchase Agreement imposed on it an existing, unconditional, and legally enforceable obligation to purchase the Greendale stock for $29 million, notwithstanding the agreement's liquidated damages provision. Kingstowne notes that if it had failed to pay the purchase price at settlement, the selling Greendale stockholders would have been entitled to retain not only their stock (and the 1,100–acre tract), but also Kingstowne's $3 million deposit and any settlement deferment payments Kingstowne had made. And, relying on *Odend'hal v. Commissioner,* 748 F.2d 908, 912 (4th Cir.1984), *cert. denied,* 471 U.S. 1143, 105 S.Ct. 3552, 86 L.Ed.2d 706 (1985), and *Estate of Franklin,* 544 F.2d at 1049, for the proposition that genuine, economically viable nonrecourse obligations may still create indebtedness for the full amount of a contract, Kingstowne argues that its real economic interest in completing the Greendale stock purchase far outweighed any economic interest it may have had in defaulting.

The Commissioner maintains, on the other hand, that the Tax Court correctly concluded that there was no legally enforceable obligation on which Kingstowne could predicate its claimed interest deduction. Citing the Tax Court's repeated acknowledgments that option contracts do not create indebtedness within the meaning of § 163(a), *see Estate of Franklin,* 64 T.C. at 762; *Howlett,* 56 T.C. at 960–61; *Batson v. Commissioner,* 43 T.C.M. (CCH) 557, 563 (1982), the Commissioner insists that Kingstowne "purchased the functional equivalent of a call option to purchase the property" because, under the Stock Purchase Agreement, Kingstowne had the "option of walking away from the deal at any time, and refusing to pay the remaining $26 million due." The Commissioner contends that, absent the threat of court-enforced sanctions, Kingstowne's obligation under the Stock Purchase Agreement was illusory; only Kingstowne could control whether the sale would take place, and "[i]f the partnership abandoned its plans to purchase the land tract for any reason, ... the sellers were powerless to compel the partnership to pay the balance due."

To resolve whether the March 8 Stock Purchase Agreement imposed on Kingstowne an existing, unconditional, and legally enforceable obligation to tender the balance of the purchase price for the Greendale stock, we must determine whether, as a practical and economic matter, the agreement bound Kingstowne to consummate the transaction or whether it merely gave Kingstowne the "power to make a choice," *i.e.,* an option.

*See Restatement (Second) of Contracts* § 25 cmt. a (1979). We conclude that the Stock Purchase Agreement obligated Kingstowne to proceed to settlement and to pay the $26 million balance of the purchase price.

■ By its very definition, indebtedness arises from a purchaser's contractual obligation to complete a transaction by paying the purchase price. While every purchaser under a bilateral contract for the sale of property can elect to default and bear the risk of damages from his default, when the price of the property equals its market value, the economic reality creating the purchaser's obligation to proceed to settlement involves no more than the loss of transaction and delay costs. Because a contract that obligates a purchaser to pay liquidated damages in an amount that would equal or exceed actual damages would impose on the purchaser the same economic incentive to consummate the transaction, undoubtedly such a contract could also create indebtedness.

■ The principle that an unconditional contract to pay a principal sum—even if executory—creates indebtedness within the meaning of I.R.C. § 163(a) extends even to nonrecourse obligations to the extent that they are genuine and economically viable. *See Odend'hal,* 748 F.2d at 912; *Estate of Franklin,* 544 F.2d at 1049. In *Odend'hal,* we recognized that a nonrecourse obligation constitutes genuine indebtedness "so long as the fair market value of the property is at least equal to the amount of the nonrecourse debt at the time it was incurred, because the taxpayer, even though he has no personal liability at stake, has an economic incentive to pay off the debt rather than to lose the collateral." 748 F.2d at 912. The case for indebtedness is yet more compelling where the taxpayer stands to lose substantial assets in addition to the underlying property.

■ An option contract, on the other hand, does not create indebtedness. *See Estate of Franklin,* 64 T.C. at 762; *Howlett,* 56 T.C. at 960–61; *Batson,* 43 T.C.M. at 563. An option requires a seller to keep his offer to sell property at a stated price open for a defined period. *See Restatement (Second) of Contracts* § 25; *Graney v. United States,* 258 F.Supp. 383, 386 (S.D.W.Va.1966), *aff'd per curiam,* 377 F.2d 992 (4th Cir.), *cert. denied,* 389 U.S. 1022, 88 S.Ct. 594, 19 L.Ed.2d 668 (1967). The would-be purchaser of the property thus pays a fee for the *choice* of whether to proceed with the purchase of the property. Inherent in that choice is the absence of any obligation to proceed. In *Estate of Franklin,* the Tax Court accurately described the effect of an option agreement:

> It gives the optionee no present estate, and imposes on him no obligation to consummate the transaction. He has the choice of exercising the option or allowing it to lapse. If an option is not exercised, the optionor becomes entitled to keep only the amount paid as consideration for granting the option ... and has no enforceable right of action against the optionee for damages.

64 T.C. at 762–63 (citations omitted).

We recognize that in some cases a contract with a liquidated damage clause may resemble an option in the sense that it permits the purchaser to back out of a transaction by forfeiting only the amounts he paid to secure the "option." But the same could be said of a contract that does not contain a liquidated damages provision where default would expose the purchaser to only minor compensatory damages. *See United States Freight Co. v. United States,* 190 Ct.Cl. 725, 422 F.2d 887, 895 (1970) (recognizing that liquidated damages provisions do not automatically convert bilateral contracts into options). Thus, to determine whether the Stock Purchase Agreement in this case imposed indebtedness on Kingstowne or merely granted it an option, we must carefully examine both the language and economic substance of the agreement.

On its face, the Stock Purchase Agreement appears to be a traditional bilateral contract encompassing substantial promises by both parties. The sellers unconditionally agreed to sell for $29 million all of their stock in Greendale and, consequently, Greendale's sole asset, the 1,100–acre tract of land in Fairfax County, Virginia. And Kingstowne unconditionally agreed to purchase the stock for $29 million, paying $3 million at the execution of the contract and agreeing to pay the balance at settlement. The contract does

not expressly give Kingstowne the option to withdraw from the transaction.

If we are to take the language of the Stock Purchase Agreement as an accurate representation of the parties' relationship, therefore, Kingstowne's contractual undertaking to pay the balance of the purchase price at settlement fits the traditional definition of indebtedness. Only from the surrounding circumstances and economic realities of the transaction could we conclude otherwise. Accordingly, we begin in this case with a presumption in favor of finding indebtedness. *Accord United States Freight*, 422 F.2d at 895–96 (holding that bilateral contract containing liquidated damages clause was not stock option for purpose of determining whether taxpayer's forfeiture loss was limited to capital treatment by I.R.C. § 1234 where contract "unequivocally obligated [taxpayer] to purchase" stock).

■ Because substance takes precedence over form in tax law, however, we cannot permit the parties' chosen language to control the tax consequences of their transaction. *See Frank Lyon Co. v. United States*, 435 U.S. 561, 573, 98 S.Ct. 1291, 1298, 55 L.Ed.2d 550 (1978) ("In the field of taxation, administrators of the laws, and the courts, are concerned with substance and realities, and formal written documents are not rigidly binding" (quoting *Helvering v. F. & R. Lazarus & Co.*, 308 U.S. 252, 255, 60 S.Ct. 209, 210, 84 L.Ed. 226 (1939))). Deductible interest can only accrue on *genuine* indebtedness. *See Knetsch v. United States*, 364 U.S. 361, 365, 81 S.Ct. 132, 134–35, 5 L.Ed.2d 128 (1960); *Midkiff*, 96 T.C. at 735 (" '[I]ndebtedness' must be indebtedness in substance and not merely in form"); *Coleman v. Commissioner*, 87 T.C. 178, 209, 1986 WL 22162 (1986), *aff'd without published opinion*, 833 F.2d 303 (3rd Cir.1987). To determine whether the March 8 Stock Purchase Agreement imposed indebtedness on Kingstowne, therefore, we must look beyond the parties' terminology to the "substance and economic realities" of the Greendale stock purchase, gleaned from the totality of the circumstances surrounding the transaction. *Accord Frank Lyon*, 435 U.S. at 582–84, 98 S.Ct. at 1303; *Estate of Franklin*, 64 T.C. at 763

("Whether the several agreements in the instant case are to be construed as constituting an option or a contract of sale depends not upon any particular phraseology used in the documents but rather upon what the parties actually did ... ").

The economic realities surrounding the transaction in this case confirm that the parties' unconditional agreement to proceed with settlement accurately portrayed their intentions. In so concluding, we rely on several factors: (1) the amount of the contractually specified liquidated damages, (2) the extent to which Kingstowne assumed real economic burdens of ownership before settlement, (3) Kingstowne's peripheral activities before settlement, and (4) the absence of apparent motives for creating an option contract.

The amount of the contractually specified damages is an important indicator of whether a contract with a liquidated damages clause imposes "indebtedness" within the meaning of I.R.C. § 163(a) because the greater the sanction for failing to discharge a contractual obligation, the less free the obligor is to walk away from the deal. *Cf. Williams v. Commissioner*, 1 F.3d 502, 507 (7th Cir.1993) ("It is true that as the amount to be forfeited creeps toward the purchase price ... a point is reached at which the sale is not of the call but of the [property] ..."). Here, the Stock Purchase Agreement provided that if Kingstowne failed to pay the purchase price at settlement, it would forfeit to the Greendale stockholders its $3 million downpayment and any settlement deferment payments it had tendered before defaulting. Consequently, depending on the date of default, Kingstowne stood to lose between $3 and $3.9 million, an amount representing 10–13% of the $29 million purchase price.

■ While the sum that Kingstowne placed at risk strikes us as consequential, both in absolute terms and in relation to the total contract price, that amount takes on greater significance when compared to the damages that the sellers would have been likely to recover upon Kingstowne's default if their contract had not included a liquidated damages clause. Because a contract that provides unconditionally for the payment of a principal sum but does not include any liqui-

dated damages clause invariably creates indebtedness, the amount of the obligee's probable damages serves as an appropriate baseline against which to measure the weight of the obligation created by a contract that includes a liquidated damages clause. Thus, if the circumstances of this case indicate that the amount of the Stock Purchase Agreement's liquidated damages would fairly approximate, or exceed, the sellers' actual damages in the event of Kingstowne's default, that fact would strongly suggest that the agreement imposed indebtedness on Kingstowne. *See United States Freight Co.*, 422 F.2d at 891 (noting that one obligee believed liquidated damages forfeited by taxpayer "approximately equaled the damages which the[obligees] could prove").

We encounter no difficulty concluding that the amount of the liquidated damages specified in the Stock Purchase Agreement amply covered the actual damages the Greendale stockholders would have suffered had Kingstowne failed to consummate the stock purchase. Because the Stock Purchase Agreement was the product of arms-length negotiations between sophisticated businessmen, we can reasonably presume that the agreed-upon purchase price represented the property's fair market value and that, therefore, the sellers' damages upon Kingstowne's default would have represented mainly transaction and delay costs. Indeed, there is nothing in the record to suggest that the Fairfax County real estate market was experiencing significant fluctuation around the time of the Greendale stock transaction or that Kingstowne was a unique purchaser willing to pay a significant premium for Greendale's land. Because the transaction in this case was a routine stock purchase, moreover, it does not appear that Greendale's stockholders expended significant transaction costs in contracting with Kingstowne. In sum, the circumstances surrounding the Stock Purchase Agreement indicate that in all likelihood the sellers would have suffered less than $3 million in actual damages had Kingstowne defaulted.

The amount of money that Kingstowne stood to lose by backing out of the Greendale stock purchase comfortably distinguishes this case from *Midkiff v. Commissioner*, 96 T.C. 724, 1991 WL 83269 (1991), *aff'd sub nom. Noguchi v. Commissioner*, 992 F.2d 226 (9th Cir.1993), upon which the Tax Court relied. *Midkiff* involved a real property transaction under a Hawaii statute that entitled certain lessees to acquire leased properties from their owners through condemnation by the Hawaii Housing Authority. Before the Housing Authority would initiate a condemnation proceeding on behalf of a lessee, it required the lessee to submit (1) a written commitment to purchase the property upon its acquisition by the Housing Authority, (2) a $500 deposit to secure the obligation, and (3) proof of the lessee's financial ability to consummate the purchase.

The taxpayers in *Midkiff* were lessees who claimed as an interest deduction under I.R.C. § 163(a) approximately $138,000 in so-called "blight of summons damages" that they had paid in addition to the value of their leased fee to settle a condemnation proceeding brought against the property's owner. *Id.* at 730–34. The taxpayers argued that they had paid the damages to compensate the owner for the delay in payment from the date of the property's valuation to the date the taxpayers received legal title because, under Hawaii law, property was deemed to have been taken on its date of valuation. The Tax Court, however, disallowed the taxpayers' claimed deduction, concluding in part that the taxpayers did not have indebtedness until the transaction closed.

The Tax Court noted in *Midkiff* that the taxpayers would have sacrificed only a nominal amount if they had failed to honor their commitment to consummate the property purchase. They would have been required to reimburse the Housing Authority and the property owner only for the expenses incurred in the condemnation proceedings, which amounted to $7,254, approximately 1.5% of the established value of the property and less than 1.2% of the total settlement price. In affirming the Tax Court's decision in *Midkiff,* the Ninth Circuit emphasized that the taxpayers were not "indebted" because the financial consequences of withdrawing from their commitment to purchase the property was so slight that the taxpayers could

"back out of the deal ... [and] elect not to exercise [their] option at any time." *Noguchi*, 992 F.2d at 227–28.

Kingstowne's obligation to the sellers in this case was, by contrast, significantly greater. If Kingstowne had defaulted, it would have forfeited as much as $3.9 million in liquidated damages, roughly 13% of the entire contract price.

The second factor that supports our finding that the Stock Purchase Agreement imposed indebtedness on Kingstowne is the extent to which Kingstowne assumed burdens of owning the 1,100–acre tract before settlement. Because the holder of an option retains the right not to purchase the subject property, he is unlikely to undertake significant obligations associated with ownership of that property. One who invests significant, unrecoverable resources in property that he does not legally own, on the other hand, is less likely to hold merely an option in that property.

Section 3 of the Stock Purchase Agreement obligated Kingstowne, upon penalty of default, to pay "when due" all engineering, planning, and development costs incurred with respect to the 1,100–acre tract after March 15, 1985. Those costs, which Greendale either billed to Kingstowne or Kingstowne paid directly, totaled more than $500,-000 during the presettlement period. Had Kingstowne not proceeded to settlement, it would have lost the benefit of those expenditures. The inclusion of such a provision in the Stock Purchase Agreement and Kingstowne's compliance with that provision provide considerable support for our conclusion that the Stock Purchase Agreement did not simply create an option giving Kingstowne free choice to proceed, or not, with settlement.

The third factor that supports our finding that the Stock Purchase Agreement imposed indebtedness on Kingstowne is its peripheral activities before settlement. There is no indication in the record that Kingstowne was looking at a number of other properties for potential development and that it simply sought to hold open its choice to pursue development of the Greendale tract. Moreover, after the rezoning was approved by Fairfax County but before settlement, Kingstowne initiated and pursued negotiations to sell portions of the 1,100–acre tract and to enter into joint development ventures with respect to other portions. While Kingstowne could not finalize any of those transactions before settlement, it did begin exchanging draft documents. And, finally, Kingstowne expended time and money to obtain loan commitments from three separate banks for the development of the tract, securing $53 million in financing before settlement.

The final factor on which we rely for our finding that the Stock Purchase Agreement imposed indebtedness on Kingstowne is the absence of any apparent motive for the parties to have created an option contract. Option contracts permit parties to shift the risks of contingencies that may affect the value of the property subject to the contract; the buyer of a call option receives the benefit of any future increases in the value of the property, while the option's seller bears the cost of any future depreciation. Where there are no significant risks to apportion, therefore, there is little reason for the parties to contract for an option.

The only contingency of any significance during the presettlement period in this case was the rezoning of the property. Although the importance of rezoning was great—Mr. Halle testified at trial that it would add $15 million to the property's value—it appears to have been almost a foregone conclusion. From his investigation and discussions with individuals in Fairfax County, Halle had concluded by the time the agreement was executed that "it was just a question of time before [the rezoning] would get done" and that "the rezoning was going to happen." Similarly, Richard North, one of Greendale's stockholders, testified at trial that he and the other sellers believed at the time the Stock Purchase Agreement was executed that the chances that the Fairfax County Board of Supervisors would approve Greendale's pending rezoning application were "very good."

To support her position that the Stock Purchase Agreement did not impose indebtedness on Kingstowne, the Commissioner relies heavily on the Tax Court's decision in

*Kaempfer v. Commissioner,* 63 T.C.M. (CCH) 1765, 1992 WL 1415 (1992). In *Kaempfer,* the taxpayer contracted with a realty company for a tax-free exchange of like-kind property. While the contract assigned a $517,500 value to the realty company's exchange property, it increased that amount by $250 each day that the taxpayer delayed closing beyond the specified exchange date.

Because the taxpayer in *Kaempfer* delayed closing for 491 days after the exchange date, the assigned value of the realty company's exchange property increased significantly. When the taxpayer later sought to deduct the amount of increase as interest under I.R.C. § 163(a), the Tax Court disallowed the deduction, in part because "there was no legally enforceable obligation on which interest could be based." *Id.* at 1769.

While we recognize superficial similarities between *Kaempfer* and this case, *Kaempfer* involved a substantially different transaction. The real estate exchange contract in *Kaempfer* assigned a fixed value to the taxpayer's exchange property, but it neither established a purchase price nor imposed on the taxpayer any obligation to pay a *fixed sum of money.* Therefore, it did not create indebtedness. In contrast, the Stock Purchase Agreement in this case unconditionally obligated Kingstowne to pay $29 million for the Greendale stock.

Based on the parties' contractual undertaking as well as the substance and economic realities of their transaction, therefore, we hold that the Stock Purchase Agreement imposed an existing, unconditional, and legally enforceable obligation upon which Kingstowne's claimed deduction could be predicated.

### III

The question remains whether the $900,000 in settlement deferment payments constituted "compensation for the use or forbearance of money" and, therefore, qualifies as "interest" within the meaning of I.R.C. § 163(a). *See Deputy v. du Pont,* 308 U.S. 488, 498, 60 S.Ct. 363, 368, 84 L.Ed. 416 (1940). In determining whether a payment represents interest, the parties' intent is controlling. *See Dunlap v. Commissioner,* 74 T.C. 1377, 1421, 1980 WL 4489 (1980), *rev'd on other grounds,* 670 F.2d 785 (8th Cir. 1982). And, consistently with the substance-over-form doctrine, we must ascertain the parties' intent primarily from the circumstances surrounding the payment, not the parties' chosen terminology. *See Midkiff v. Commissioner,* 96 T.C. 724, 734, 744, 1991 WL 83269, *aff'd sub nom. Noguchi v. Commissioner,* 992 F.2d 226 (9th Cir.1993); *L–R Heat Treating Co. v. Commissioner,* 28 T.C. 894, 897, 1957 WL 1111 (1957).

The Commissioner argues that the settlement deferment payments were not interest because the parties did not designate those payments as interest anywhere in the Stock Purchase Agreement. Kingstowne responds, however, that the parties' failure to label the settlement deferment payments as interest is immaterial because the payments corresponded specifically to the contract purchase price, the prevailing rate of interest, and the time of deferral. We agree with Kingstowne.

The substance of the Greendale stock purchase convinces us that the parties intended Kingstowne's settlement deferment payments as interest within the meaning of § 163(a). As explained above, the payments were not intended to secure an option. There is nothing in the record to suggest, moreover, that the payments were made for any purpose other than to compensate the Greendale stockholders for their forbearance of the $26 million purchase price balance that was due at settlement. Indeed, the Tax Court found that as a percentage of the unpaid purchase price, each of the settlement deferment payments approximated the market rate of interest during the relevant period. And both Warren Halle and Richard North testified at trial that the settlement deferment payments were intended to compensate the Greendale stockholders for the opportunity cost of Kingstowne's deferment of settlement as well as to allow Greendale to service the approximately $16 million mortgage it was carrying on its land.

While the Stock Purchase Agreement does not describe the settlement deferment payments as interest, neither does it label them as proceeds from the sale of stock. Further-

more, the parties did not credit any of the deferment payments against the contract price of the Greendale stock. We conclude that the economic reality of Kingstowne's settlement deferment payments is that they represented interest, notwithstanding the parties' failure to label them as such.

## IV

Because we conclude that the $900,000 Kingstowne paid to the Greendale stockholders to defer settlement pursuant to their Stock Purchase Agreement qualifies as "interest paid or accrued on indebtedness," it is deductible under I.R.C. § 163(a). Accordingly, we reverse the Tax Court's decision and remand this case to the Tax Court with instructions to grant Kingstowne's petition for readjustment of partnership items with respect to its claimed interest deduction.

*REVERSED AND REMANDED.*

MICHAEL, Circuit Judge, dissenting:

I respectfully dissent. I would affirm on the reasoning of the Tax Court, *see Kingstowne L.P. v. Commissioner,* 68 T.C.M. (CCH) 1497, 1994 WL 709347 (1994) (T.C. Memo.1994–630), and I will explain briefly why I believe the Tax Court was exactly right in disallowing the claimed interest deduction.

Kingstowne's goal, if it could buy Greendale's stock, was to turn 1,100 acres owned by Greendale into a residential real estate development. Kingstowne needed, and received, the option to back out of its agreement to buy Greendale's stock. At the time the Stock Purchase Agreement was signed, Greendale had an application pending to rezone the land to allow higher density residential development. Kingstowne did not obtain a financing commitment for the purchase until after the original settlement date had passed. That financing commitment from the Riggs National Bank was contingent upon the approval of Greendale's rezoning application. The Stock Purchase Agreement's liquidated damages provision allowed Kingstowne to default by forfeiting the down payment and the monthly payments to extend the settlement date. It is obvious why Kingstowne wanted the liquidated damages clause: if rezoning did not occur, if it could not obtain financing, or if it got cold feet for any reason, it wanted (and had) the opportunity to back out with limited exposure. Thus, as the Tax Court held:

> Prior to the settlement, the partnership [Kingstowne] was free to decide not to settle for any reason or for no reason at all, albeit forfeiting its downpayment and all monthly payments that it had made to the sellers to extend settlement. We recognize that the partnership would have paid a substantial price for abandoning the project. This price, however, does not convert the partnership's obligation to the sellers into an indebtedness within the meaning of section 163.

68 T.C.M. (CCH) at 1502 (T.C. Memo. 1994–630, at 16).*

---

* The down payment of $3 million ($2 million in cash and a $1 million non-interest bearing note) and the extension payments of $900,000 equalled about 13 percent of the purchase price of $29 million. The amount that could have been forfeited is thus within the reasonable limits for an option. *See Williams v. Commissioner,* 1 F.3d 502, 507 (7th Cir.1993).

In an evident attempt to distinguish *Williams,* the majority argues, without citation to the record, that the liquidated damages approximated the amount of actual damages Kingstowne would pay if it defaulted. This "fact," according to the majority, makes the $3 million indebtedness. *Ante* at 655–56. The majority, however, ignores the purpose of an option. When a buyer purchases an option, he places on the seller the risk that the price of the stock (or the land) will rise or fall. If, during the period between the purchase of an option and the date the option expires, the fair market value of the stock (or the land) significantly drops, then the buyer will choose not to exercise the option knowing that all he will lose is the price paid for the option. If, however, the fair market value of the stock (or the land) increases or stays within an amount that the buyer is willing to pay, then the buyer will exercise the option. Thus, in this case, Kingstowne was buying the right to purchase the land for $29 million, and it was willing to pay $3 million up front, plus $225,000 per month, to retain that right prior to the settlement date. If the fair market value of the land fell by a significant amount (or if Kingstowne could not pay the balance of the purchase price), then Kingstowne could walk away from the deal knowing the full amount of its exposure. The error, therefore, that the majority makes is to assume that Kingstowne—at the time it entered into the Stock

Moreover, the parties did not intend the settlement extension payments to constitute interest. The Stock Purchase Agreement, which is the only document discussing the settlement extension payments, does not mention interest anywhere. The Greendale owners, upon receiving the monthly extension payments, reported them as additional sales proceeds paid for their stock, evidencing their belief that the payments were not interest. And, Kingstowne itself initially treated the payments as miscellaneous income to the sellers, as demonstrated by its issuance of Forms 1099–MISC (miscellaneous income) to the sellers, rather than Forms 1099–INT.

Finally, on the record before us, I do not believe that the benefits and burdens of ownership passed to Kingstowne prior to the settlement date. As the Tax Court said:

The sellers' retention [until settlement] of primary liability for rezoning costs and mortgage debt is a significant burden of ownership. Although the partnership [Kingstowne] was responsible for reimbursing the sellers at settlement for any rezoning costs incurred after March 1985, and the partnership even paid some of these directly prior to settlement, the sellers remained primarily liable for any obligations associated with the property, including mortgage payments....

Prior to settlement, the partnership initiated negotiations with various developers with respect to the property, but, until it obtained the sellers' stock and liquidated the company, the partnership could not have finalized any of these development proposals. The partnership ultimately benefited from the approval of the sellers' rezoning application by Fairfax County, but only because the partnership proceeded to settlement. Although the partnership assumed the burdens of funding the rezoning process, if it had not settled, the

sellers had no legal right to force the partnership to bear these costs.

68 T.C.M. (CCH) at 1503 (T.C. Memo. 1994–630, at 20–21).

In sum, the payments to extend the settlement date were simply not deductible as interest.

Purchase Agreement—knew that actual damages (which could not be known until any default occurred) would approximate the liquidated damages, i.e., the option price. Perhaps Kingstowne could reasonably speculate about what actual damages would be, but Kingstowne did not want to speculate. Rather, it wanted the

right to buy the land without the risk that the value would significantly fall, and it wanted to be able to walk away from the deal if it could not obtain zoning approval and financing. And the price for placing the risk on the Greendale owners was 13 percent of the purchase price, a reasonable amount to pay for an option.