125 T.C. No. 12

UNITED STATES TAX COURT

FEDERAL HOME LOAN MORTGAGE CORPORATION, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 3941-99, 15626-99.    Filed November 21, 2005.

P received commitment fees for entering into prior
approval purchase contracts with mortgage originators.
The contracts obligated P to purchase mortgages from
originators during a specified period of time pursuant
to a pricing formula but did not require the
originators to sell mortgages to P.  The commitment
fees equaled 2.0 percent of the principal amount of the
mortgages.  The commitment fees consisted of a 0.5-
percent nonrefundable portion and a 1.5-percent
refundable portion.  In the taxable years 1985 through
1990, P treated the 0.5-percent nonrefundable portion
of the commitment fees as premiums received for writing
put options.  As a result, when an originator sold a
mortgage to P, P treated the 0.5-percent portion of the
fee as a reduction of its purchase price and reported
this amount as income over the estimated life of the
mortgage.  If an originator failed to sell the mortgage
to P, P reported the 0.5 percent of the fee in the year

in which the originator failed to exercise its right to sell the mortgage.  R determined that the nonrefundable commitment fees should have been reported in the taxable year that P received the payment.

   Held:  In substance and form, P's prior approval purchase contracts were put options, and P properly reported the nonrefundable portion of the commitment fees as option premiums.

Robert A. Rudnick, James F. Warren, Alan J. Swirski, Richard J. Gagnon, Jr., and B. John Williams, Jr., for petitioner.

Gary D. Kallevang, for respondent.


                         OPINION

   RUWE, Judge:  Respondent determined deficiencies in petitioner's Federal income taxes in docket No. 3941-99 as follows:

| Year | Deficiency |
| --- | --- |
| 1985 | $36,623,695 |
| 1986 | 40,111,127 |

Petitioner claims overpayments of $9,604,085 for 1985 and $12,418,469 for 1986.

   Respondent determined deficiencies in petitioner's Federal income taxes in docket No. 15626-99 as follows:

| Year | Deficiency |
| --- | --- |
| 1987 | $26,200,358 |
| 1988 | 13,827,654 |
| 1989 | 6,225,404 |
| 1990 | 23,466,338 |

Petitioner claims overpayments of $57,775,538 for 1987, $28,434,990 for 1988, $32,577,346 for 1989, and $19,504,333 for 1990.

In this Opinion, we decide whether certain nonrefundable commitment fees that mortgage originators paid to petitioner to enter into Conventional Multifamily Prior Approval Purchase Contracts (prior approval purchase contracts) are to be recognized when those fees are paid or should be treated as premium for "put" options, which would defer recognition until after delivery or nondelivery of the underlying mortgages.[1]  This issue is one of several involved in these cases.[2]

## Background

The parties submitted this issue fully stipulated pursuant to Rule 122.[3]  The stipulations of fact and the attached exhibits are incorporated herein by this reference.  At the time it filed the petitions, petitioner maintained its principal office in

---

[1] The adjustments proposed in the notices of deficiency for 1985 through 1990 pertaining to the commitment fee issue included a small amount of commitment fees related to single-family optional delivery mixed in with the prior approval program.  The parties have since resolved the commitment fee issue as to the single-family program.

[2] See Fed. Home Loan Mortgage Corp. v. Commissioner, 121 T.C. 129; 121 T.C. 254; 121 T.C. 279 (2003); T.C. Memo. 2003-298.

[3] All Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code in effect for the taxable years in issue.

McLean, Virginia.  At all relevant times, petitioner was a corporation managed by a board of directors.

Petitioner was chartered by Congress on July 24, 1970, by title III (Federal Home Loan Mortgage Corporation Act) of the Emergency Home Financing Act of 1970, Pub. L. 91-355, 84 Stat. 450.  Petitioner was established to purchase residential mortgages and to develop and maintain a secondary market in conventional mortgages.  A "conventional mortgage" is a mortgage that is not guaranteed or insured by a Federal agency.  The "primary mortgage market" is composed of transactions between mortgage originators (lenders, such as savings and loan organizations) and homeowners or builders (borrowers).  The "secondary market" generally consists of sales of mortgages by originators, and purchases and sales of mortgages and mortgage-related securities by institutional dealers and investors.  Since its incorporation, petitioner has facilitated investment by the capital markets in single-family and multifamily residential mortgages.  In the course of its business, petitioner acquires residential mortgages from loan originators.  Petitioner's business is a high-volume, narrow-margin business.

A.   Multifamily Mortgage Program

A multifamily mortgage loan is a loan secured on a property consisting of an apartment building with more than four residences.  Petitioner offered originators two programs for

selling multifamily mortgages:  (1) The immediate delivery purchase program, and (2) the prior approval conventional multifamily mortgage purchase program (prior approval program).

### 1. Immediate Delivery Purchase Program

Petitioner designed the immediate delivery purchase program to accommodate the purchase of mortgages already closed and on an originator's books at the time an originator enters into a purchase contract with petitioner.  Although this program is designed for portfolio mortgages, an originator may enter into an immediate delivery purchase contract with petitioner before actually closing on the mortgage.  However, if for some reason the mortgage cannot be delivered, petitioner can impose sanctions on an originator.

To participate in the immediate delivery purchase program, an originator telephones petitioner to make an offer for a purchase contract.  When petitioner receives a telephone offer from an originator, that offer is "an irrevocable offer that the [originator] may not modify."  Petitioner may accept an offer within 2 business days of receiving the telephone offer.  When petitioner accepts an offer, it executes two copies of the purchase contract and mails the contract to an originator. Within 24 hours of receiving the purchase contract, an originator must execute the contract and mail one copy along with a $1,500 nonrefundable application/review fee or 0.1 percent of the

purchase contract, whichever is greater, to petitioner's applicable regional office. If an originator failed to acknowledge and submit a copy of a purchase contract, petitioner may disqualify or suspend an originator as an eligible seller to petitioner. After completing a documentation review, underwriting, and property inspections, if any, petitioner's applicable regional office will contact an originator. The mortgages acceptable to petitioner will be identified and purchased.

An originator must deliver the mortgages to petitioner within the 30-calendar-day commitment period. In most cases, the penalty for nondelivery is disqualification or suspension of an originator from eligibility to sell mortgages to petitioner.[4]

Under the immediate delivery purchase program, petitioner established its required net yield when originators offered the

---

[4] Petitioner's Sellers' & Servicers' Guide, which is part of the contract, states that petitioner "may disqualify or suspend a * * * [an originator] for * * * [an originator's] failure to deliver any documents under a * * * mandatory delivery purchase program, as required by section 0601". Sec. 0601 of the Sellers' and Servicers' Guide states that "Delivery under the * * * immediate delivery purchase programs is mandatory. * * * Delivery is not mandatory under the home mortgage optional delivery purchase programs." The guide also provides that petitioner may disqualify or suspend an originator for "failure to observe or comply with any term or provision of the purchase document". In addition to disqualification and suspension, petitioner "reserves the right to take whatever other action it deems appropriate to protect its interests and enforce its rights".

contracts. The required net yield is the interest rate that petitioner will receive from the mortgage it purchases from an originator. Petitioner did not charge an upfront commitment fee in its immediate delivery purchase program.

### 2. Prior Approval Program

Alternatively, originators may sell multifamily mortgages to petitioner under the prior approval program, which began in 1976. Under this program, petitioner entered into contracts with originators to purchase a multifamily mortgage before the closing date of the mortgage. In general, each executed prior approval purchase contract pertained to a single mortgage, as opposed to a pool of mortgages. Petitioner's promotional pamphlets state that this program offered originators the "peace of mind" of knowing that petitioner would purchase the loan once it closed. The pamphlets also explain that once an originator entered into a prior approval purchase contract with petitioner, "delivery of the loan is still optional, so [the originators] don't have to worry if the deal hits a snag or falls through completely."

Under the prior approval program, originators were not obligated to deliver the multifamily mortgage to petitioner. Petitioner's Sellers' & Servicers' Guide is part of the contract between an originator and petitioner. Petitioner's Sellers' & Servicers' Guide states: "Delivery under this program is optional. However, unless the optional delivery contract is

converted to a mandatory delivery contract within the 60-day optional delivery period, the mortgage may not be delivered and [petitioner] will retain the entire 2-percent commitment fee required pursuant to section 3004."  The Sellers' & Servicers' Guide also provides:

> The optional delivery date stated in the purchase contract will be within 60 days from the date [petitioner] issues the purchase contract plus the 10-business-day period in which the [originator] may accept the purchase contract.  During the 60-day period, if the [originator] intends to deliver the mortgage(s) to [petitioner], the [originator] must convert the optional delivery purchase contract to a 30-day mandatory delivery purchase contract.  * * *

To receive a prior approval purchase contract from petitioner, an originator must submit a request for prior approval of a specific multifamily project.  Along with the request, an originator paid a nonrefundable loan application fee of the greater of $1,500 or 0.10 percent of the original principal amount of the mortgage (but not in excess of $2,500).  After completion of processing, including underwriting and property inspections, petitioner would determine whether the mortgage was acceptable.  Id.  If acceptable, petitioner would execute a prior approval purchase contract (also called Form 6), which it mailed to an originator.  An originator wishing to participate in the prior approval program would execute the Form 6, and mail or deliver it to petitioner no later than 10 business days from the

date of petitioner's offer.  Form 6 would set forth details of
the specific mortgage that an originator could deliver.

Between 1985 and 1991, petitioner required an originator to
submit a 2-percent commitment fee with the executed prior
approval purchase contract.  During the years at issue, the 2-
percent commitment fee consisted of a 0.5-percent nonrefundable
portion and a 1.5-percent portion that was refundable if an
originator delivered the mortgage under the prior approval
purchase contract.[5]  Petitioner was entitled to keep the
nonrefundable portion when it entered into the agreement.  The
0.5-percent portion of the commitment fee received by petitioner
was not held in trust or escrow and was subject to unfettered
control by petitioner.

If an originator did not deliver the specific mortgage to
petitioner, it forfeited the 1.5-percent refundable portion of
the commitment fee.  Forfeiture of the refundable portion of the
fee in the event of nondelivery functioned as a delivery

---

[5] In 1982, petitioner charged a commitment fee equal to 2
percent of the commitment amount (the principal amount of the
mortgage to be delivered), which was fully refunded to a mortgage
originator if the mortgage was delivered.  In September 1983, the
commitment fee was changed so that the amount charged to a
mortgage originator was still 2 percent, with 1 percent being
nonrefundable and 1 percent refundable when the mortgage loan was
delivered.  The commitment fee structure was changed again for
the years in issue.

incentive consistent with petitioner's business preference to buy mortgages in the secondary market.[6]

Under the prior approval program, an originator had the right, but not the contractual obligation, to elect at any time during the ensuing 60 days (or in some cases 15 days) to enter into a mandatory commitment to deliver a conforming mortgage to petitioner.  Under this program, petitioner committed to purchasing a mortgage when an originator delivered it to petitioner within the delivery period.[7]

Petitioner required originators to service the mortgages they sold to petitioner.  Originators received compensation for performing this service (the compensation is known as the minimum servicing spread).  For the years at issue, the minimum servicing fee (the originator's retained spread over the life of the mortgage) was 25 basis points (bps)[8] on mortgages less than $1 million, 12.5 bps on mortgages between $1 and $10 million, and was negotiable on mortgages more than $10 million.

---

[6] For Federal income tax purposes, the 1.5-percent refundable portion of the commitment fee was treated by petitioner as a payable upon its receipt and was taken into income only if the underlying mortgages were not delivered to petitioner.  Petitioner's tax accounting for the 1.5-percent refundable portion of the fee is not at issue.

[7] The Sellers' & Servicers' Guide does not use the term "put options" or "put option" to describe these commitment arrangements.

[8] A basis point (bp) is 1/100th of a percent.

To exercise its delivery right under a prior approval purchase contract, an originator was required to give notice of conversion to petitioner and enter into a 30-day "mandatory delivery contract" on Form 64A, Conventional Multifamily Immediate Delivery Purchase Contract and Prior Approval Conversion Amendment. An originator could elect to deliver the multifamily mortgage at petitioner's maximum required net yield or at an alternate required net yield.[9] Petitioner's required net yield was the rate at which originators could contract to deliver a mortgage under the immediate delivery purchase program. The maximum required net yield was the fixed rate, or locked-in interest rate, that petitioner and an originator had previously agreed upon in Form 6.[10] The alternate required net yield was the rate at which an originator could contract to deliver a mortgage to petitioner under the immediate delivery purchase program as quoted by petitioner on any day during the 60-day (or

_____

[9] Effective July 1986, upon electing to effectuate delivery with a mandatory delivery contract with an alternative required net yield, an originator could request an increase in the maximum amount of the mortgage to be delivered. The amount of any increase was at the sole discretion of petitioner. Upon the request for an increase, an originator was required to remit $1,000 plus 2 percent of the increased mortgage amount within 24 hours. Of this 2 percent, 0.5 percent was nonrefundable and, if approved, petitioner was entitled to retain the fee. Upon purchase of the mortgage, petitioner refunded 1.5 percent of the total mortgage amount as increased.

[10] The maximum required net yield is the maximum interest rate that petitioner may receive from the mortgage delivered by an originator.

15-day) optional delivery period; if the required net yield moved
downward, an originator could select the lower required net
yield. The purchase price and net yield to petitioner became
fixed upon an originator's selection of either the maximum
required net yield, or the alternate required net yield on any
day during the 60-day (or 15-day) period that an originator
elected an alternate required net yield. The purchase price
either would reflect a discount from par (100 percent of unpaid
principal balance (UPB)) or would be at par, depending on the
relationship of the rate on the mortgages (coupon rate) actually
tendered by an originator to the "minimum gross yield", which was
the sum of the required net yield selected and the minimum
servicing spread.[11]

For example, suppose an originator and petitioner entered
into a prior approval purchase contract with respect to a
mortgage in the maximum amount of $6 million. The originator
paid the 2-percent commitment fee in the amount of $120,000. The
mortgage was subject to a maximum mortgage interest rate of
12.595 percent, and the maximum required net yield to petitioner
was 12.470 percent. The difference, 0.125 percent or 12.5 bps,
represents the minimum spread to be retained by an originator for

_____

[11] When an originator serviced a mortgage for petitioner, it
received the amount of interest on the mortgage in excess of the
required net yield. The minimum servicing spread is the
difference between the maximum mortgage interest rate and the
maximum required net yield.

servicing the mortgage, or $7,500/year.  If an originator contemplated selling the subject mortgage to another buyer in lieu of petitioner, it would have to consider the effect of forfeiting the otherwise refundable portion of the commitment fee, or $90,000, in comparison to the spread it could obtain with another purchaser.

In the event that petitioner's required net yield on any day during the 60-day (or 15-day) period exceeded the "maximum required net yield", petitioner could be required on that day to contract to purchase conforming mortgages at the maximum required net yield stated on the Form 6, instead of at its current day required net yield.  This arrangement effectively ensured that an originator could make a mortgage loan to a borrower at a particular rate, and would be protected against having to sell it to petitioner at a discount from par, or at an additional discount as a result of an increase in petitioner's required net yield during the 60-day (or 15-day) period.  Because it could select the maximum required net yield if market rates increased, an originator was assured of dealing at a rate that was no higher than was specified in the prior approval purchase contract. Thus, an upward movement in interest rates normally would not prevent an originator from delivering a mortgage under the prior approval program.  Alternatively, if interest rates went down, an originator would have the benefit (whether in the form of a

greater spread or less of a discount from UPB) of selecting an alternate required net yield in lieu of the higher maximum required net yield as stated in the prior approval purchase contract.[12]

If an originator selected an alternate required net yield, it was required to give notice of this selection no later than the date of conversion to mandatory delivery. If an originator failed to give notice of conversion to a mandatory commitment within 5 business days of selecting an alternate required net yield, the prior approval purchase contract would be terminated, and petitioner would retain the entire 2-percent commitment fee.

Nondelivery generally occurred when the borrower repudiated or defaulted on its arrangement with the originator so that the originator did not have the mortgage to deliver.[13] Unlike originators who entered into an immediate delivery purchase program, when an originator participating in the prior approval program failed to deliver a mortgage, it was not disqualified or suspended as an eligible seller of mortgages to petitioner.

---

[12] If petitioner's required net yield on the day of delivery election was lower than the maximum required net yield, an originator holding a higher than current market-rate mortgage would normally obtain a spread greater than the minimum servicing spread specified in sec. 2603 of petitioner's Sellers' and Servicers' Guide.

[13] An originator finding a more attractive opportunity for disposing of a mortgage had to consider the forfeiture of the 1.5-percent refundable portion of the commitment fee.

In computing its taxable income for the years 1985 through 1991, petitioner treated the 0.5-percent nonrefundable portion of the commitment fees as premium received for writing put options in favor of the various mortgage originators. Petitioner generally did not include in taxable income amounts received for the 0.5-percent nonrefundable portion of the commitment fee in the year of receipt. Petitioner deducted such nonrefundable amounts from the cost basis of mortgages purchased when originators delivered mortgages to petitioner. Petitioner amortized these amounts into income over multiyear periods of 7 or 8 years (i.e., the estimated life of the mortgages in petitioner's hands).[14] If an originator failed to elect mandatory delivery of the specified mortgages within the prescribed period, petitioner recognized the nonrefundable portion of the commitment fee in the current year if the last day of the 60-day (or 15-day) period was within the current year.

During the years 1985 through 1991, petitioner received the 0.5-percent nonrefundable portion of the commitment fees pursuant to the prior approval program in amounts totaling $9,506,398, $16,489,524, $9,408,907, $4,525,606, $4,892,445, $2,805,392, and $41,257, respectively. On its corporate returns for the years

---

[14] When a mortgage was delivered in the same year that petitioner received the commitment fee, petitioner recognized the nonrefundable portion of the commitment fee in the year of receipt, to the extent of amortization for that year.

1985 through 1993, petitioner included taxable income of $5,636,762, $16,627,101, $2,035,928, $2,601,628, $3,213,184, $3,563,858, $3,569,015, $3,569,015, and $3,569,015, respectively. The adjustments in dispute in the 1985-90 taxable years are the net differences between the amounts of nonrefundable commitment fees received and reported for tax purposes, as follows:

| Nonrefundable Commitment Fees | Received | Reported | Amount in Dispute 1985-90 |
|---|---|---|---|
| 1985 | $9,506,398 | $5,636,762 | $3,869,636 |
| 1986 | 16,489,524 | 16,627,101 | (137,577) |
| 1987 | 9,408,907 | 2,035,928 | 7,372,979 |
| 1988 | 4,525,606 | 2,601,628 | 1,923,978 |
| 1989 | 4,892,445 | 3,213,184 | 1,679,261 |
| 1990 | 2,805,392 | 3,563,858 | (758,466) |

In computing its taxable income for the year 1985, petitioner overstated its income attributable to such receipts under its method of accounting in the amount of $883,638 as a result of a computational error.

During the years 1985 through 1988, and 1990, originators failed to deliver at least 67 mortgages specified in prior approval purchase contracts to petitioner.[15] See appendix, which lists these 67 contracts. As a result, the 1.5-percent refundable portion of the 2-percent commitment fee was forfeited to petitioner. During the relevant period, these 67 contracts

---

[15] Petitioner was unable to locate records of the prior approval purchase contracts executed in 1989 that would identify the mortgages from that year, if any, where the specified mortgages were undelivered.

represent approximately 1 percent (by value and number) of all the contracts that petitioner entered into in the prior approval program. Petitioner was not necessarily informed of the precise reason for the nondelivery; petitioner believes that the typical reason for nondelivery was failure of the underlying mortgage to have been consummated.

## Discussion

Petitioner argues that the 0.5-percent nonrefundable portions of the commitment fees that originators paid to enter into prior approval purchase contracts constitute "put" option[16] premiums, the tax treatment of which could not be determined until originators either exercised the options or allowed them to lapse. Respondent disagrees, arguing that the 0.5-percent nonrefundable portions of the commitment fees are not option premium because the prior approval purchase contracts are not option contracts. Respondent argues that petitioner had a fixed right to the nonrefundable portion of the commitment fees when the prior approval purchase contracts were executed and that section 451 requires petitioner, as an accrual basis taxpayer, to recognize the nonrefundable commitment fees in the year of receipt because its right to retain the commitment fees was fixed and determined.

---

[16] A "put" option gives the option holder the right, but not the obligation, to sell something at an agreed upon price or pricing formula for a limited period of time.

Section 451(a) generally provides that "The amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period." Accrual method taxpayers normally recognize income when "all the events have occurred which fix the right to receive" income and the amount of income "can be determined with reasonable accuracy." Sec. 1.451-1(a), Income Tax Regs. However, as more fully explained, infra, payments of option premiums are not recognized when received, even when the recipient has a fixed right to retain the payments, because the character of those payments is uncertain until the option has been exercised or has lapsed. E.g., Old Harbor Native Corp. v. Commissioner, 104 T.C. 191, 200 (1995). Because of the unique facts in this case, we must examine the rules governing the tax treatment of option premiums and the policy underlying those rules to decide whether a prior approval purchase contract constitutes an option for Federal income tax purposes.

"An option has historically required the following two elements: (1) A continuing offer to do an act, or to forbear from doing an act, which does not ripen into a contract until accepted; and (2) an agreement to leave the offer open for a specified or reasonable period of time." Id. at 201 (citing

Saviano v. Commissioner, 80 T.C. 955, 970 (1983), affd. 765 F.2d 643 (7th Cir. 1985)).  "The primary legal effect of an option is that it limits the promisor's power to revoke his or her offer.  An option creates an unconditional power of acceptance in the offeree."  Id. (citing 1 Restatement, Contracts 2d, sec. 25(d) (1981)).  An option normally provides a person a right to sell or to purchase "'at a fixed price within a limited period of time but imposes no obligation on the person to do so'".  See Elrod v. Commissioner, 87 T.C. 1046, 1067 (1986) (quoting Koch v. Commissioner, 67 T.C. 71, 82 (1976)).  An agreement that purports to be an "option", but is contingent or otherwise conditional on some act of the offering party, is not an option.  Saviano v. Commissioner, supra at 970.

An option contract grants the optionee the right to accept or reject an offer according to its terms within the time and manner specified in the option.  Estate of Franklin v. Commissioner, 64 T.C. 752, 762 (1975), affd. on other grounds 544 F.2d 1045 (9th Cir. 1976); 1 Williston on Contracts, sec. 5:16 (4th ed. 2004).  Options have been characterized as unilateral contracts because one party to the contract is obligated to perform, while the other party may decide whether or not to exercise his rights under the contract.  U.S. Freight Co. v. United States, 190 Ct. Cl. 725, 422 F.2d 887, 894 (1970).  Courts have found that the holder of an option must have a "truly

alternative choice" to exercise the option or to allow it to lapse. Id. at 895; see also Halle v. Commissioner, 83 F.3d 649, 654 (4th Cir. 1996), revg. and remanding Kingstowne L.P. v. Commissioner, T.C. Memo. 1994-630; Koch v. Commissioner, supra at 82. Thus,

> the clear distinction between an option and a contract
> of sale is that an option gives a person a right to
> purchase [or sell] at a fixed price within a limited
> period of time but imposes no obligation on the person
> to do so, whereas a contract of sale contains mutual
> and reciprocal obligations, the seller being obligated
> to sell and the purchaser being obligated to buy.
> [Koch v. Commissioner, supra at 82.]

Option payments are not includable in income to the optionor until the option either has lapsed or has been exercised. Kitchin v. Commissioner, 353 F.2d 13, 15 (4th Cir. 1965), revg. T.C. Memo. 1963-332; Va. Iron Coal & Coke Co. v. Commissioner, 99 F.2d 919 (4th Cir. 1938), affg. 37 B.T.A. 195 (1938); Elrod v. Commissioner, supra at 1066-1067; Koch v. Commissioner, supra at 89. In Rev. Rul. 58-234, 1958-1 C.B. 279, 283-284, the Commissioner has reiterated these same principles:

> An optionor, by the mere granting of an option to
> sell ("put"), or buy ("call"), certain property, may
> not have parted with any physical or tangible assets;
> but, just as the optionee thereby acquires a right to
> sell, or buy, certain property at a fixed price during
> a specified future period or on or before a specified
> future date, so does the optionor become obligated to
> accept, or deliver, such property at that price, if the
> option is exercised. Since the optionor assumes such
> obligation, which may be burdensome and is continuing
> until the option is terminated, without exercise, or
> otherwise, there is no closed transaction nor
> ascertainable income or gain realized by an optionor
> upon mere receipt of a premium for granting such an

option.  The open, rather than closed, status of an
unexercised and otherwise unterminated option to buy
(in effect a "call") was recognized, for Federal income
tax purposes, in A. E. Hollingsworth v. Commissioner,
27 B.T.A. 621, * * * (1933).  It is manifest, from the
nature and consequences of "put" or "call" option
premiums and obligations, that there is no Federal
income tax incidence on account of either the receipt
or the payment of such option premiums, i.e., from the
standpoint of either the optionor or the optionee,
unless and until the options have been terminated, by
failure to exercise, or otherwise, with resultant gain
or loss.  The optionor, seeking to minimize or conclude
the eventual burden of his option obligation, might pay
the optionee, as consideration for cancellation of the
option, an amount equal to or greater than the premium.
Hence, no income, gain, profits, or earnings are
derived from the receipt of either a "put" or "call"
option premium unless and until the option expires
without being exercised, or is terminated upon payment
by the optionor of an amount less than the premium.
Therefore, it is considered that the principle of the
decision in North American Oil Consolidated v. Burnet,
286 U.S. 417 * * * (1932), which involved the receipt
of "earnings," is not applicable to receipts of
premiums on outstanding options.

Rev. Rul. 58-234, 1958-1 C.B. at 284, 285, summarizes the tax

treatment of put option premiums as follows:

> [T]he amount (premium) received by the writer (issuer
> or optionor) of a "put" or "call" option which is not
> exercised constitutes ordinary income, for Federal
> income tax purposes, under section 61 of the Internal
> Revenue Code of 1954, to be included in his gross
> income only for the taxable year in which the failure
> to exercise the option becomes final.

> *      *      *      *      *      *      *

> [W]here a "put" option is exercised, the amount
> (premium) received by the writer (issuer or optionor)
> for granting it constitutes an offset against the
> option price, which he paid upon its exercise, in
> determining his (net) cost basis of the securities that

he purchased pursuant thereto, for subsequent gain or loss purposes.   * * *

See also Rev. Rul. 78-182, 1978-1 C.B. 265.

A contract is an option contract when it provides (A) the option to buy or sell, (B) certain property, (C) at a stipulated price, (D) on or before a specific future date or within a specified time period, (E) for consideration.  W. Union Tel. Co. v. Brown, 253 U.S. 101, 110 (1920); Halle v. Commissioner, supra at 654; Old Harbor Native Corp. v. Commissioner, 104 T.C. at 201; Estate of Franklin v. Commissioner, supra at 762-763; Rev. Rul. 58-234, supra.  To determine whether a contract constitutes an option, courts look at the contractual language and the economic substance of the agreement.  Halle v. Commissioner, supra.

Petitioner's prior approval purchase contracts exhibit the following characteristics of an option for tax purposes:  (1) The prior approval purchase contracts satisfy the formal requirements of option contracts; (2) the economic substance of the prior approval purchase contracts indicates that the contracts are an option; and (3) the rationale for granting open transaction treatment to option premium applies to petitioner's transactions.

1.   Formal Requirements of the Option

Petitioner's prior approval purchase contracts provide for the optional delivery of mortgages by an originator.  The Sellers' and Servicers' Guide states:  "Delivery under this program is optional.  However, unless the optional delivery

contract is converted to a mandatory delivery contract within the 60-day optional delivery period, the mortgage may not be delivered". (Emphasis added.) The contractual terms specifically provide that an originator has the right, but not an obligation, to sell the mortgage to petitioner. The prior approval purchase contract specified the mortgage that petitioner was obligated to purchase if an originator exercised its option. To participate in the prior approval program, an originator would execute and deliver to petitioner a Form 6, which set forth the details of a specific mortgage to be delivered.

Despite the language of the prior approval purchase contracts, respondent argues that the form of the contracts does not create an option. In support of his argument, respondent quotes the Sellers' & Servicers' Guide, which states: "'Under this program, [petitioner] will contract with the [originator] before the closing date of the mortgage to purchase a multifamily mortgage on a specific existing project.'" Respondent argues that the terms contain an explicit offer to purchase by petitioner and an explicit acceptance by an originator.

We agree that petitioner has made an explicit offer to purchase an originator's mortgage; this is consistent with an option contract. In fact, an essential characteristic of an option contract is that one party is obligated to perform, while the other party may decide whether or not to exercise his rights under the contract. U.S. Freight Co. v. United States, 190 Ct.

Cl. 725, 422 F.2d 887 (1970). Respondent's position ignores both the reality and the language in the Sellers' & Servicers' Guide that delivery of the mortgage by an originator is "optional".

Respondent argues that the prior approval purchase contracts are not options because these contracts lack a fixed purchase price that petitioner will pay in the event an originator delivered a mortgage. Respondent contends that the price was not fixed because an originator could deliver a mortgage at either the maximum required net yield or the alternate required net yield, which was not fixed until an originator converted a prior approval purchase contract into a mandatory delivery contract.

The prior approval purchase contracts establish a formula to determine the price, which petitioner and an originator agreed to use. Form 6 identified the amount of the mortgage that petitioner was obligated to purchase. The maximum required net yield provides the minimum price that petitioner would pay to an originator to purchase the mortgage. While the alternate required net yield allowed an originator to potentially receive a more favorable purchase price, we do not think that this feature of the contract changes the fact that the parties to the prior approval purchase contracts agreed to a formula that determined

the stipulated price.  See Estate of Franklin v. Commissioner, 64 T.C. at 763-764.

In an option contract, the seller agrees to hold an offer open for a specified period of time.  Old Harbor Native Corp. v. Commissioner, supra at 201.  It is clear that the prior approval purchase contracts establish a specific time for an originator to exercise its right to sell the mortgage to petitioner.

Petitioner granted an option for consideration.  The Sellers' and Servicers' Guide states:

> A commitment fee of 2 percent of the amount of the purchase contract must be submitted by the [originator] with the executed purchase contract. Three-fourths of the commitment fee is refundable on the Freddie Mac funding date, when the mortgage, meeting all of the terms of the purchase contract and section 3803, is delivered to the applicable Freddie Mac regional office on or before the delivery date stated in the purchase contract.

When petitioner and an originator entered into a prior approval purchase contract, petitioner was entitled to retain the 0.5-percent nonrefundable portion of the commitment fee.  This nonrefundable portion of the commitment fee constitutes consideration to petitioner for granting an option.

2.  Economic Substance of the Option

An essential part of any option is that its potential value to the optionee and its potential future detriment to the optionor depends on the uncertainty of future events.  An optionee is willing to pay for potential future value, and the optionor is willing to accept a potential future detriment for a

price.  For example, in a typical put option, the optionee is willing to pay a premium to the optionor for the right to sell a security to the optionor at an agreed price sometime in the future.  If the market value of the security falls below the exercise price, the optionee can sell the security to the optionor at a price greater than its value on the exercise date. That potential opportunity is what the optionee paid for. Likewise, the premium received by the optionor is compensation for accepting the potential risk of having to purchase at an unfavorable price.  If the market value of the security rises above the exercise price, the option will not be exercised, and the optionor keeps the option premium for having accepted the risk associated with uncertainty.

The prior approval program involves an option to sell exercisable by an originator.  An originator (optionee) can choose to enforce its rights to sell a mortgage to petitioner (optionor) at an agreed pricing formula but is under no legal obligation to do so.  During the period when it can exercise its option to sell, the originator can choose between the agreed maximum yield for petitioner or, if interest rates fall, a lesser yield for petitioner.  If interest rates rise above the agreed

maximum yield, petitioner is required to purchase the mortgage on terms less favorable than they would have been at current rates.

The option of whether to sell the mortgage also protects an originator from the risk it might not close the subject mortgage, making the sale to petitioner impossible. Without the option, the originator's failure to deliver could result in serious sanctions including the originator's disqualification from further dealings with petitioner. An originator could avoid the commitment fee altogether by entering into an immediate delivery purchase contract; however, a failure to deliver the mortgage to petitioner under an immediate delivery purchase contract can result in sanctions including disqualification of an originator from future mortgage sales to petitioner. In most cases, the penalty for nondelivery is disqualification of an originator from eligibility to sell mortgages to petitioner. Given petitioner's prominent position in the secondary mortgage market, disqualification of an originator would seem to be of great importance to an originator and would explain why an originator is willing to pay the nonrefundable commitment fee in return for retaining the option to deliver the mortgage. The uncertainty of an originator's ability to deliver a mortgage that has not closed and the potential detriment to be suffered in that event, constitutes a future contingency that the optionee is willing to pay to protect itself against. This contingency, while apparently unlikely to occur, is obviously of sufficient concern

to originators to justify selection of the prior approval purchase contract and payment of the nonrefundable portion of the commitment fee, rather than entering into an immediate delivery purchase contract and risk default and the related sanctions. Petitioner, on the other hand, is willing to make delivery optional, and thereby give up the rights and remedies it would have had under an immediate delivery contract, in return for the nonrefundable portion of the commitment fee.

Respondent argues that the possible forfeiture of the 1.5-percent refundable portion of the commitment fee makes it virtually certain that the mortgage sale will be consummated, negating any real option for an originator. Petitioner acknowledges that potential loss of the refundable portion of the commitment fee was intended to encourage an originator to sell the mortgage if there was a mortgage to sell. Indeed, an originator's agreement to forfeit the nonrefundable portion indicates its intent to follow through with the sale if possible. But the possible inability to deliver and related sanctions were apparently of sufficient concern to originators to justify payment of the 0.5-percent nonrefundable portion in order to make delivery optional. If such risk were not significant, originators could simply have entered into mandatory delivery contracts and avoided the nonrefundable fee.

Respondent cites Halle v. Commissioner, 83 F.3d 649 (4th Cir. 1996), as authority for his argument that there was no

option.  In Halle, a corporation owned land, which the taxpayer wanted to purchase.  The taxpayer formed a limited partnership to purchase all the stock of the corporation.  The limited partnership and the corporation entered into a stock purchase agreement, which stated that "'Seller hereby agrees to sell to Buyer, and Buyer agrees to purchase from Seller'" the stock of the corporation for $29 million.  The agreement required the limited partnership to pay a $3 million deposit and the balance at settlement.  The agreement permitted the limited partnership to defer the settlement date by paying monthly installments of $225,000.  If the limited partnership defaulted, the contract provided that it would forfeit the downpayment and monthly installments already paid.  The limited partnership paid the seller $900,000 to defer settlement and deducted those payments as settlement interest on its income tax returns.  The Commissioner disallowed the claimed interest deduction, arguing that the agreement was an option.

The Court of Appeals for the Fourth Circuit examined the language of the stock purchase agreement and the economic substance of the transaction to determine whether the contract was an option.  The Court found that under the terms of the agreement, the seller had an unconditional obligation to sell the stock, the limited partnership had an unconditional obligation to purchase the stock, and the agreement did not expressly provide the limited partnership with the option to withdraw from the

transaction.  The court also found that the economic substance of the stock purchase agreement created indebtedness.  To find that the contract created indebtedness, the court relied on "(1) the amount of the contractually specified liquidated damages, (2) the extent to which [the limited partnership] assumed real economic burdens of ownership before settlement, (3) [the limited partnership's] peripheral activities before settlement, and (4) the absence of apparent motives for creating an option contract." Id. at 655.

Unlike Halle v. Commissioner, supra, we find that the terms and the economic realities of the prior approval purchase contracts indicate that these contracts were options.  The Sellers' & Servicers' Guide indicates that the prior approval purchase contract offers an alternative to the immediate delivery purchase program when an originator and the borrower have not closed on a mortgage.  By entering into an immediate delivery purchase contract, an originator could receive a commitment from petitioner without paying the 0.5-percent nonrefundable fee. However, originators who participated in the prior approval program chose to pay the commitment fee to protect themselves from fluctuations in interest rates during the period when the option was open and the uncertainty associated with the possibility that the mortgages might not close within the delivery period.  Had originators been absolutely certain that they could deliver the mortgages, they could have entered into an

immediate delivery purchase contract and avoided any commitment fee. The prior approval purchase contracts provided an originator with protection in the event it could not deliver a mortgage to petitioner. Thus, despite the fact that originators delivered mortgages to petitioner in approximately 99 percent of the prior approval purchase contracts, originators were apparently willing to pay a premium for the option because they were uncertain about when or whether they would in fact have a mortgage to sell to petitioner.

### 3. Rationale for Option Treatment

The policy rationale for the tax treatment of an option as an open transaction is that the outcome of the transaction is uncertain at the time the payments are made. That uncertainty prevents the proper characterization of the premium at the time it is paid. See Dill Co. v. Commissioner, 33 T.C. 196, 200 (1959), affd. 294 F.2d 291 (3d Cir. 1961). "Since the optionor assumes such obligation, which may be burdensome and is continuing until the option is terminated, without exercise, or otherwise, there is no closed transaction nor ascertainable income or gain realized by an optionor upon mere receipt of a premium for granting such an option." Rev. Rul. 58-234, 1958-1 C.B. at 283.

Respondent argues that open transaction treatment is inappropriate because petitioner had a fixed right to the nonrefundable portion of the commitment fee at the time the prior

approval purchase contracts were executed.  However, the fixed

right to a payment does not determine the tax treatment of an

option premium.  In <u>Va. Iron Coal & Coke Co. v. Commissioner</u>, 37

B.T.A. 195 (1938), affd. 99 F.2d 919 (4th Cir. 1938), the

taxpayer received payments for an option and had a fixed right to

retain them.  The Court explained that these payments were

entitled to open transaction treatment, despite the taxpayer's

right to retain the payments, because the taxpayer did not know

whether the funds would represent income or a return of capital

when they were received.

The uncertainty associated with the 0.5-percent

nonrefundable portion of the commitment fee is similar to the

uncertainty described by the Board of Tax Appeals in <u>Va. Iron</u>

<u>Coal & Coke Co. v. Commissioner</u>, <u>supra</u>.  In that case (involving

a call option), the Court stated:

> Had the option been exercised, they [the premium] would
> have represented a return of capital, that is, a
> recovery of a part of the basis for gain or loss which
> the property had in the hands of the seller.  In that
> event they would not have been income and their return
> as income when received would have been improper.
> * * *  But in case of termination of the option and
> abandonment by the Texas Co. of its right to have the
> payments applied as a part of the purchase price, it
> would be apparent for the first time that the payments
> represented clear gain to the petitioner.  In that
> case, since no property would be sold, there would be
> no reason to reduce the basis of that retained.

<u>Id.</u> at 198.  In the instant case, when an originator delivered a

mortgage, petitioner properly treated the nonrefundable portion

of the commitment fee as a reduction in the consideration that it

paid for the mortgage.  See Rev. Rul. 78-182, 1978-1 C.B. 265, 266; Rev. Rul. 58-234, 1958-1 C.B. at 285 ("[W]here a 'put' option is exercised, the amount (premium) received by the writer (issuer or optionor) for granting it constitutes an offset against the option price, which he paid upon its exercise, in determining his (net) cost basis of the securities that he purchased pursuant thereto, for subsequent gain or loss purposes.").  In those instances when an originator failed to deliver a multifamily mortgage to petitioner within the delivery period, petitioner realized income in the year that an originator allowed the option to lapse.  See Rev. Rul. 58-234, supra.

Finally, respondent relies on Chesapeake Fin. Corp. v. Commissioner, 78 T.C. 869 (1982), to support his argument against treating the nonrefundable portion of the commitment fee as option premium.  In Chesapeake Fin. Corp., the taxpayer made construction and permanent loans available to developers and received commitment fees.  Typically, a borrower would apply for a loan for a proposed project, and the taxpayer would determine whether the project was economically feasible.  If the taxpayer decided the project was feasible, it would obtain the borrower's authorization to place a loan with an institutional investor.  If the institutional investor approved the loan, it issued a commitment to the taxpayer; upon acceptance, the commitment constituted a contract between the institutional investor and the taxpayer.  The commitment specified the terms of the proposed

loan and generally required the taxpayer to pay a nonrefundable commitment fee. Most commitments also required the taxpayer to pay an additional "deposit fee" in the event the loan failed to close. The "deposit fee" usually equaled 1 percent of the proposed loan. When the taxpayer received the commitment from the institutional investor, the taxpayer issued its own commitment to the borrower, which incorporated the terms and conditions of the institutional investor's commitment. The borrower was required to pay a commitment fee and an additional fee equal to the nonrefundable fee that the taxpayer paid to the institutional investor. The taxpayer had a fixed right to the commitment fee when the borrower accepted its commitment; however, the taxpayer reported the fees in income when the loans were permanently funded. The taxpayer argued that under the "all events" test, it had not earned the fees until the loans were actually funded.

The Court found that the taxpayer's "commitment fees were received as a payment for specific services rendered to the borrower in arranging for a favorable loan package for the borrower with an institutional investor." Id. at 878. The Court explained that the commitment fees compensated the taxpayer for "evaluating the economic potential of the proposed project, finding a willing investor to provide financing and then negotiating two separate commitments, one from the institutional investor and one that it issues to the borrower." Id. The Court

held that the commitment fees were taxable in the year of receipt.[17]

The commitment fees in <u>Chesapeake Fin. Corp.</u> are distinguishable from the nonrefundable portion of the commitment fees received by petitioner for granting options. Whereas the taxpayer in <u>Chesapeake Fin. Corp.</u> acted as a loan originator for the borrower, petitioner agrees to purchase a mortgage from an originator.[18] <u>Chesapeake Fin. Corp.</u> involved a factually different type of transaction, and does not govern the tax treatment of petitioner's commitment fees. Indeed, in <u>Chesapeake Fin. Corp.</u>, there was apparently no argument and certainly no consideration or discussion by the Court about whether the fees might constitute option premiums. Instead, the taxpayer in <u>Chesapeake Fin. Corp.</u> argued that the "all events" test was satisfied when the loans were actually funded, not when it received the fees.

---

[17] In addition to the fees in issue, petitioner also received a nonrefundable application/review fee of the greater of $1,500 or 0.10 percent of the original principal amount of the mortgage (but not in excess of $2,500). This fee, which is not at issue, appears to compensate petitioner for the type of services for which the taxpayer received commitment fees in <u>Chesapeake Fin. Corp. v. Commissioner</u>, 78 T.C. 869 (1982).

[18] Loans are not sales transactions. "When a taxpayer receives a loan, he incurs an obligation to repay that loan at some future date. Because of this obligation, the loan proceeds do not qualify as income to the taxpayer." <u>Commissioner v. Tufts</u>, 461 U.S. 300, 307 (1983). Petitioner did not make loans to the originators; instead, petitioner agreed to purchase a mortgage from the originators.

Conclusion

Because the terms and the economic substance of the prior approval purchase contracts indicate that petitioner and originators entered into option contracts, we hold that petitioner properly treated the 0.5-percent nonrefundable portion of the commitment fees as option premiums.

To reflect the foregoing,

An appropriate order will be issued.

APPENDIX

Mortgages Not Delivered to Petitioner Under the Prior Approval
Program

During the taxable years 1985 through 1988, and 1990, the 67

mortgages, which the originators failed to deliver to petitioner,

are as follows:

| | Contract No. | Contract Amount | Expiration of 60-day (or 15-day) Period | 0.5 Percent Nonrefundable Fee |
|---|---|---|---|---|
| 1 | 8504030076 | $1,000,000 | 5/17/85 | $5,000 |
| 2 | 8501170017 | 153,000 | 6/7/85 | 765 |
| 3 | 8510110117 | 430,000 | 11/10/85 | 2,150 |
| 4 | 8505100095 | 100,000 | 11/15/85 | 500 |
| 5 | 8511050016 | 560,000 | 12/5/85 | 2,800 |
| 6 | 8511210097 | 4,200,000 | 12/21/85 | 21,000 |
| 7 | 8605200051 | 2,939,000 | 6/2/86 | 14,695 |
| 8 | 8602070074 | 269,000 | 8/11/86 | 1,345 |
| 9 | 8607310296 | 1,365,000 | 8/30/86 | 6,825 |
| 10 | 8512120155 | 600,000 | 9/9/86 | 3,000 |
| 11 | 8606130126 | 539,000 | 9/10/86 | 2,695 |
| 12 | 8607170569 | 1,145,000 | 9/10/86 | 5,725 |
| 13 | 8602260159 | 100,000 | 9/17/86 | 500 |
| 14 | 8609220258 | 2,450,000 | 9/30/86 | 12,250 |
| 15 | 8609090420 | 194,000 | 10/9/86 | 970 |
| 16 | 8609100388 | 2,365,000 | 10/10/86 | 11,825 |
| 17 | 8609150342 | 4,020,000 | 10/15/86 | 20,100 |
| 18 | 8607110490 | 1,145,000 | 10/23/86 | 5,725 |
| 19 | 8609290083 | 504,000 | 10/29/86 | 2,520 |
| 20 | 8608060428 | 1,312,000 | 11/3/86 | 6,560 |
| 21 | 8610270173 | 396,000 | 11/4/86 | 1,980 |
| 22 | 8610300720 | 297,000 | 11/7/86 | 1,485 |
| 23 | 8610300728 | 250,000 | 11/7/86 | 1,250 |
| 24 | 8603260291 | 1,635,000 | 11/12/86 | 8,175 |
| 25 | 8610140245 | 750,000 | 11/13/86 | 3,750 |
| 26 | 8605160050 | 250,000 | 11/14/86 | 1,250 |
| 27 | 8607140072 | 379,000 | 11/17/86 | 1,895 |
| 28 | 8610210279 | 738,000 | 11/20/86 | 3,690 |
| 29 | 8611200558 | 350,000 | 11/24/86 | 1,750 |
| 30 | 8610200110 | 410,000 | 11/25/86 | 2,050 |
| 31 | 8610310637 | 354,000 | 11/30/86 | 1,770 |
| 32 | 8611040013 | 605,000 | 12/4/86 | 3,025 |
| 33 | 8612150095 | 268,000 | 12/17/86 | 1,340 |
| 34 | 8611210206 | 300,000 | 12/21/86 | 1,500 |
| 35 | 8612240362 | 1,565,000 | 2/4/87 | 7,825 |
| 36 | 8704300034 | 537,000 | 7/14/87 | 2,685 |
| 37 | 8708100024 | 355,000 | 10/9/87 | 1,775 |
| 38 | 8708120349 | 1,600,000 | 10/11/87 | 8,000 |
| 39 | 8708120350 | 850,000 | 10/11/87 | 4,250 |
| 40 | 8708120351 | 255,000 | 10/11/87 | 1,275 |
| 41 | 8708200206 | 1,400,000 | 10/19/87 | 7,000 |

| 42 | 8708200328 | 515,000 | 10/19/87 | 2,575 |
|----|-----------|---------|----------|-------|
| 43 | 8709255114 | 1,080,000 | 10/25/87 | 5,400 |
| 44 | 8712075071 | 525,000 | 1/6/88 | 2,625 |
| 45 | 8801225093 | 2,602,000 | 2/21/88 | 13,010 |
| 46 | 8802085188 | 700,000 | 3/9/88 | 3,500 |
| 47 | 8803245036 | 450,000 | 4/23/88 | 2,250 |
| 48 | 8805105385 | 1,712,000 | 6/9/88 | 8,560 |
| 49 | 8808055045 | 2,900,000 | 9/4/88 | 14,500 |
| 50 | 8808265106 | 2,000,000 | 9/25/88 | 10,000 |
| 51 | 8809305154 | 3,400,000 | 10/30/88 | 17,000 |
| 52 | 8810045195 | 800,000 | 11/3/88 | 4,000 |
| 53 | 8810175155 | 585,000 | 11/16/88 | 2,925 |
| 54 | 8811215091 | 700,000 | 11/28/88 | 3,500 |
| 55 | 8811085234 | 3,600,000 | 12/8/88 | 18,000 |
| 56 | 8811095145 | 750,000 | 12/9/88 | 3,750 |
| 57 | 8912125085 | 4,240,000 | 1/11/90 | 21,200 |
| 58 | 8912115094 | 985,000 | 1/26/90 | 4,925 |
| 59 | 9001105083 | 970,000 | 2/9/90 | 4,850 |
| 60 | 9001255072 | 835,000 | 2/24/90 | 4,175 |
| 61 | 9002055068 | 2,335,000 | 3/7/90 | 11,775 |
| 62 | 9001195042 | 700,000 | 4/10/90 | 3,500 |
| 63 | 9002205045 | 130,000 | 5/22/90 | 650 |
| 64 | 9001175071 | 5,490,000 | 6/29/90 | 27,450 |
| 65 | 9007115075 | 100,000 | 8/10/90 | 500 |
| 66 | 9002215058 | 256,000 | 10/1/90 | 1,280 |
| 67 | 9008135001 | 667,700 | 12/31/90 | 3,335 |
| | Total | $77,961,700 | | $389,905 |